THE GRANITE OIL SECURITIES, INC., A CORPORA-
TION, APPELLANT, *v.* DOUGLAS COUNTY, A
POLITICAL SUBDIVISION OF THE STATE OF NEVADA;
JAMES W. TEIPNER, JR. AND JAMES W. TEIP-
NER, SR., A COPARTNERSHIP, DOING BUSINESS
UNDER THE FIRM NAME AND STYLE OF "T AND
T ENGINEERING COMPANY"; AND DOUGLAS
INDUSTRIES, INC., A CORPORATION, RESPOND-
ENTS.

No. 3596

June 8, 1950.                                          219 P.2d 191.

*John R. Ross* and *Paul D. Laxalt,* both of Carson City, for Appellant.

*Grover L. Krick,* District Attorney of Douglas County, of Minden, and *Ernest S. Brown,* of Reno, for Respondents.

## OPINION

By the Court, BADT, J.:

This appeal presents for our consideration the question, of first impression in this state, of whether a county of this state in exercising a private or proprietary function, under the circumstances and statutory authorization involved, may be liable for damages for its tort. Appellant, as plaintiff below, filed its complaint against Douglas County and others alleging the execution on June 15, 1948 of a lease from respondent Douglas County to Douglas Industries, Inc., whereunder the latter was granted the right to use and operate what was known as Tahoe-Douglas Airport and its facilities from July 1, 1948, to July 1, 1949, and that the lessee thereafter operated said airport for profit under the terms of the said lease agreement. The lease agreement, attached

as an exhibit, stated in its preamble that the county was the owner and in control of the airport and desired to secure revenue from said property, and in that connection entered into the agreement. Some of the provisions thereof were as follows:

1. The lessee had the right to the use of said airport and to operate a coffee shop and cocktail bar thereon. 2. It agreed to carry public liability insurance "in a reasonable amount covering its acts and operations" thereon. 4. The county agreed to maintain the airport and its buildings thereon. 5. The lessee was given an option to renew for an additional year. 6. The lessee agreed to pay $100 a month rental. 7. "The First Party [Douglas County] agrees to install facilities, tanks and pumps for gasoline, and radio equipment at said airport, and the second Party agrees to pay to First Party one cent royalty on all gasoline sold at the airport by the Second Party." 8. Douglas County agreed to employ a man on full time to perform such work as might be required by both parties. 14. "Second Party [Douglas Industries, Inc.] agrees to use diligent efforts to promote increased aeronautical activities at the airport, and to secure persons who wish to base their aeronautical activities at the airport, either as fixed-base users or non-scheduled air carriers, or as lessees." 17. The lessee agreed to keep adequate records and books of account open to the county's inspection and to render monthly accountings. 20. It agreed to carry industrial and accident insurance on all employees and to keep the premiums paid sixty days in advance. The lease also contained numerous protective clauses for the benefit of the county.

The complaint then alleges that by virtue of the contract Douglas County did install facilities, gasoline tanks, pumps and other equipment and employed a man to work in and about the airport, and through its county commissioners entered into a contract with T and T Engineering Company for the purchase and installation

of two gasoline pumps with necessary equipment, including electric switches, starting switches, electric motors, wiring, etc., all of which were installed by the said engineering company with the knowledge, consent and approval of Douglas County in what was known as a "gas pit"; and that by reason of negligence in the matter of such installation, the lack of safety devices, etc., resulting in a continuous leaking and accumulation of gasoline and explosive gases, an explosion and fire resulted, destroying plaintiff's airplane which was at the time stored in the county's hangar on said airport. Separate and several counts of negligence are alleged with considerable particularity, and the sufficiency of the pleading in such regard is not challenged. Plaintiff filed a claim with the county, which was disallowed, and the filing of the complaint followed. Damage of $13,000 was alleged for the total destruction of the plane, plus the sum of $5,000 for loss of six months' use thereof. Douglas County demurred (1) for want of facts, (2) for the court's lack of jurisdiction of the county or the subject matter, and (3) "that the plaintiff does not have legal capacity to sue this defendant." The district court sustained the demurrer and thereafter entered judgment dismissing the complaint against the defendant county. This appeal followed.

The legislature of Nevada, by Stats.1928, p. 10, passed "An Act authorizing and empowering any city or county or any town or any municipal corporation in the State of Nevada to acquire land and construct and complete improvements thereon necessary or convenient to the maintenance or operation of airports, the flying and landing of aircraft, and the maintenance and operation of hangars for storing aircraft; permitting use for said purposes of property owned for park purposes; providing for the incurring of indebtedness and the issuing of bonds for said purposes, and for the levying of taxes therefor; declaring such use to be a public use; and matters in connection therewith." The act is found in

secs. 289–293, N.C.L.1929. Section 1 of this act authorizes any city, county, town or municipal corporation in the state to acquire and use real property within or without its corporate limits upon which might be erected and maintained necessary airport facilities including hangars, mooring masts, places for flying, taking off and landing of aircraft and the storage of the same when not in active use, together with lights, radio equipment, service shops, etc., to such extent as might be necessary or convenient; to levy taxes for the purpose; reciting that lands previously acquired for park purposes might be used for such airport purposes, appurtenances, appliances or other conveniences necessary or useful in connection therewith.

Section 1 of "An Act in relation to county contracts," approved March 16, 1895, Stats.1895, c. 96, p. 88, had prohibited any member of any board of county commissioners from voting on any contract extending beyond his term of office. Stats.1945, c. 151, p. 239, repealed said act insofar as it applied to airports and permitted the execution of agreements or leases of real and personal property within the counties for use and occupancy as airports, airport facilities, or airport service "to whom and upon such conditions and terms as they deem proper, for a term or terms not exceeding twenty (20) years."

In 1947 the legislature of Nevada enacted an act known as the "Municipal Airports Act," Stats.1947, c. 215, p. 713. The title indicates that it is an act providing, among other things, "for acquisition, construction, maintenance, operation, and regulation by municipalities and counties of airports and air navigation facilities * * *, declaring such to be a public purpose; * * * authorizing leasing of airports, supplying of services in airport operation, * * * authorizing joint action by municipalities and other public agencies * * *; and to make uniform the law with reference to public municipal airports." As used in the act "municipality" means any county, city or town of this state. Broad powers are

given to such municipalities for the acquisition and operation of airports. Such powers are detailed over many sections and many pages and need not be detailed here. Powers therein given to the "governing body" are defined to mean "the governing body of a county or municipality." Agreements are authorized between any two or more such public agencies participating in the acquisition, maintenance and operation of airports, which agreements may specify, among other things, the proportionate interest of each public agency in the property, facilities and privileges involved, the proportion to be borne by each agency in the costs of acquisition, construction, installation of equipment, etc., as well as the proportion of the expense of maintenance, operation, etc., and the distribution of the proceeds received and "the assumption or payment of any indebtedness arising from the joint venture." The public agencies thus acting jointly pursuant to the authority of the act are further authorized to create a joint board consisting of members appointed by the governing body of each participating agency. The powers of such joint board are defined in some detail and in particular "such board may exercise on behalf of its constituent public agencies all the powers of each with respect to such airport * * *." The joint board may enter into leases. Its resolutions, rules and regulations, when approved by the respective constituent public agencies, have the same force and effect in the several jurisdictions involved as the ordinances, resolutions, etc., of each such agency would have in its own jurisdiction. A joint fund is created into which moneys are deposited as provided by the joint agreement. Each of the constituent public agencies must provide its own share of the fund. Federal, state or other contributions or loans, as well as revenues obtained from the joint operation of the airport must be paid into the joint fund, and disbursements therefrom are made by order of the joint board. It becomes important to consider in its entirety sec. 24 of the act which reads as follows:

"24. The acquisition of any land or interest therein

pursuant to this act, the planning, acquisition, establishment, development, construction, improvement, maintenance, equipment, operation, regulation, protection, and policing of airports and air navigation facilities, including the acquisition or elimination of airport hazards, and the exercise of any other powers herein granted to municipalities and other public agencies, to be severally or jointly exercised, are hereby declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity; and in the case of any county, are declared to be county functions and purposes as well as public and governmental; and in the case of any municipality other than a county, are declared to be municipal functions and purposes as well as public and governmental. All land and other property and privileges acquired and used by or on behalf of any municipality or other public agency in the manner and for the purposes enumerated in this act shall and are hereby declared to be acquired and used for public and governmental purposes and as a matter of public necessity, and, in the case of a county or municipality, for county or municipal purposes, respectively."

Strangely enough not only does the complaint make no mention of the fact that the operations of Douglas County and of its lessee, or the agreement involved, were in pursuance of the 1947 act, but the elaborate briefs of both counsel fail to mention it, and it was not until the oral argument that such Uniform Airport Act was called to the attention of the court.

The opinion of the district court is based largely upon its conclusion that under the terms of the agreement it appeared that Douglas County engaged only to *maintain* the airport while Douglas Industries, Inc., engaged to *operate* it. The italics were used by the district court. Respondent county however did not advance such theory to this court and both parties conceded, impliedly at least, that the activities of Douglas County were such as to include therein actual functions in the operation of the airport. The learned district judge, however, wisely considered the 1947 act which, as noted, both

parties ignored in their briefs. In the last analysis the learned district judge found in favor of sovereign immunity of counties from suit in failure of direct statutory authority waiving their immunity and in failure of any contrary holding by this court.

■ It is well-settled law, frankly conceded by the respondent county, that when a municipal corporation acts in its private, corporate or proprietary capacity, it may be sued for its torts. Respondent contends however that (with the exception of some jurisdictions which are not in harmony with the rule in this state) such rule has never been extended to counties, and that "the rule in Nevada is that counties are political subdivisions of the state and are not liable for torts in the absence of legislative authority"; and that by reason of such rule of law "the question of whether or not an airport by a county is a proprietary function becomes totally immaterial." In support of this contention respondent relies on Schweiss v. First Judicial District Court, 23 Nev. 226, 45 P. 289, 34 L.R.A. 602, and McKay v. Washoe General Hospital, 55 Nev. 336, 33 P.2d 755, 36 P.2d 78. It is our opinion that neither of these two cases may be said to control the present controversy.

In Schweiss v. District Court petitioner sought a writ prohibiting his prosecution for selling liquor without a license required by an ordinance of Virginia City, on the ground that the legislature (Stats. 1895, p. 73) had passed an act incorporating Storey County and including therein the city of Virginia and the town of Goldhill. The court analyzed the legislative act in detail and, in declaring it unconstitutional, made the remark, unnecessary to its decision, relied upon by counsel. The court there said: "Clearly, a county is not a municipal corporation. If it were, there would have been no occasion for this act changing Storey county into a municipality. It is, at the most, only a *quasi* corporation, and possesses only such powers, and is subjected to only such liabilities, as are specially provided for by law." It does not, under its facts, touch the question we are considering.

But more strongly respondent relies upon McKay v.

Washoe General Hospital, 55 Nev. 336, 33 P.2d 755, 756, 36 P.2d 78. Respondent takes the following out of its context and contends that it is controlling here: "It is the well-recognized general rule that a county, which is but a political subdivision of a state (a quasi corporation, Schweiss v. First Judicial District Court, 23 Nev. 226, 45 P. 289, 34 L.R.A. 602), cannot be sued without legislative consent (15 C.J. 568,[1] Story on Agency [9th Ed.] § 319)."

It should be noted however that the action was not against Washoe County but against Washoe General Hospital and certain other persons as members of the board of hospital trustees for damages resulting from the negligence of a hospital nurse. The complaint alleged the organization of Washoe General Hospital pursuant to Chap. 169, Stats. 1929, which authorized the establishment of a hospital for the benefit of the inhabitants of any county and authorized such hospital to treat pay patients. This court there defined the issue as "whether the defendants can be sued at all." It further stated: "The liability of an organization created by statute must be determined under an interpretation of the statute creating it, and, though the defendant hospital was not created by a legislative act, it was organized pursuant to such an act, and we must look to the intention of the Legislature in enacting the law authorizing the organization of defendant hospital, in reaching a conclusion in this case."

The court further said that it was the plain intention of the legislature to set up a public institution "which should own no property, have no income and no method of raising money, and hence no liability to pay anything," and not the legislative intent to make such institution liable in damages. The opinion closed by saying:

---

[1]Strangely enough, this citation (while not in point because the county was not a party defendant in the McKay case) goes on to say "* * * a county is liable for its torts when it is acting, not as a governmental agent, but as a private corporation, or is performing special duties imposed on it with its consent, or voluntarily assumed by it." Id. 569, n. 69.

"Furthermore, the failure of the Legislature to provide that the defendant [the hospital, not the county] might sue and be sued is a conclusive reason why this action cannot be maintained." On rehearing the court again emphasized the question involved as being "whether the defendants can be sued at all." It is clear therefore that the question involved in the instant case, namely, whether a county can be sued in damages for tort for acts performed in a private and proprietary capacity was not involved. As noted, Washoe County was not a party to the action, and the court did not even discuss the question of whether or not the operation of a county hospital was a governmental function. As to this question see, generally, 26 Am.Jur. 595; Borchard, "Governmental Liability in Tort"; 34 Yale Law Journal, 246.

Respondent now urges (in its oral argument) that we must look to the provisions of 1947 act to reach a determination as to the county's liability just as this court in the McKay case examined the 1929 statute to determine the liability of Washoe General Hospital. This is true only in a sense, for if Douglas County is otherwise liable in damage for tort by reason of its negligent acts in its proprietary capacity, we may then look to the 1947 act to see whether immunity from suit was afforded by the legislature.

Respondent stands squarely on the contention "that a county, being a political subdivision of the state, cannot be sued in tort, regardless of the nature of the function, without legislative authorization."

In the annotation to Henderson v. Twin Falls County, 56 Idaho 124, 50 P.2d 597, 101 A.L.R. 1151, 1167 (which held the county liable for its negligence in treating a pay patient in its hospital, as acting in a proprietary capacity), the status of case law on the subject is stated as follows: "Although in some cases (see Dillwood v. Riecks (1919) 42 Cal.App. 602, 184 P. 35; Hollenbeck v. Winnebago County (1880) 95 Ill. 148, 35 Am.Rep. 151, and O'Brien v. Rockingham County (1923) 80 N.H. 522,

120 A.254, infra), the view has been expressed that as a county is merely a subdivision of the state, its activities are invariably public and governmental, in the following cases the possibility of the exercise, by a county, of private or proprietary functions, with a consequent loss of immunity from liability, is recognized:" Cases are then cited from the United States Circuit Court, Alabama, Hawaii, Idaho, Illinois, Michigan, Missouri, New York and Pennsylvania. To these must now be added North Carolina in a case later discussed. From the states indicated as holding contra, we are disposed to remove California, for in two later cases than in the one above cited, California has clearly indicated its adherence to the rule for the liability of a county for torts of its officers where the county is acting in a proprietary capacity. Leach v. Dinsmore, 22 Cal.App.Supp.2d 735, 65 P.2d 1364; Calkins v. Newton, 36 Cal.App.2d 262, 97 P.2d 523, 526. In both of these cases the functions performed by the counties were held to be governmental, so that these two cases cannot be said to be directly in point, but the meaning is unmistakable. Calkins v. Newton is of particular importance for its analysis of Henderson v. Twin Falls County, supra, and its apparent agreement with the Idaho case as well as other recent decisions[2] holding "that the rule of sovereign nonliability, as such, should be abandoned and that a county should be held to the same degree of liability for tort as a municipality in the exercise of a function that is not governmental, but proprietary."

While it is said that the doctrine holding counties liable for torts committed in the exercise of proprietary functions has been of much later development than a similar doctrine for municipalities, we find that doctrine clearly expressed in the early case of Hannon v. County of St. Louis, 62 Mo. 313, decided in 1876. There the county made a contract for laying a water pipe from a

[2]Bell v. City of Pittsburgh, 297 Pa. 185, 146 A. 567, 64 A.L.R. 1542; Wilcox v. Eire County, 252 App.Div. 20, 297 N.Y.S. 287; Smith v. Westchester County, 253 App.Div. 725, 300 N.Y.S. 201.

city to the county insane asylum, and an excavation caved in and killed one of the workmen. It was held that the duty in which the county was engaged was not one imposed by law upon all counties but a self-imposed one and that *quoad hoc* the county was a private corporation, engaged in a private enterprise. In Coburn v. San Mateo County, C.C., N.D.Cal., 75 F. 520, decided in 1896, the county kept tearing down the plaintiff's gate and fence to open up a road to Pebble Beach, and the court not only granted an injunction but awarded damages. We cite these as among the early cases. Later cases are overwhelmingly in support of the liability of counties for tort when acting in their proprietary capacity. Coburn v. San Mateo County, C.C. 1896, 75 F. 520; Jones v. Jefferson County, 1920, 206 Ala. 13, 89 So. 174; Matsumura v. County of Hawaii, 1908, 19 Hawaii 18, 21 Ann.Cas. 1338; Anduha v. Maui County, 1927, 30 Hawaii 44; Henderson v. Twin Falls County, 56 Idaho 124, 50 P.2d 597, 101 A.L.R. 1151; Symonds v. Board of Sup'rs of Clay County, 1874, 71 Ill. 355; Jennings v. Peoria County, 1915, 196 Ill.App. 195; Gunther v. Cheboygan County, 1923, 225 Mich. 619, 196 N.W. 386; Moross v. Hillsdale County, 1928, 242 Mich. 277, 218 N.W. 683; Hannon v. St. Louis County, 1876, 62 Mo. 313; Hughes v. Monroe County, 1895, 147 N.Y. 49, 41 N.E. 407, 39 L.R.A. 33; Markey v. Queens County, 1898, 154 N.Y. 675, 49 N.E. 71, 39 L.R.A. 46; Lefrois v. Monroe County, 1900, 162 N.Y. 563, 57 N.E. 185, 50 L.R.A. 206; Moest v. City of Buffalo, 1906, 116 App.Div. 657, 101 N.Y.S. 996; O'Brien v. Westchester County, 1919, 189 App.Div. 13, 177 N.Y.S. 507; Cleveland v. Town of Lancaster, 1933, 239 App.Div. 263, 267 N.Y.S. 673; Kelley v. Cumberland County, 1910, 229 Pa. 289, 78 A. 276; Bell v. City of Pittsburgh, 1929, 297 Pa. 185, 146 A. 567, 64 A.L.R. 1542; Cousins v. Butler County, 1919, 73 Pa.Super. 86.

But more convincing than any of the foregoing authorities and directly on the point involved is the case of Rhodes v. City of Asheville, 230 N.C. 134, 52 S.E.2d 371,

376, under a statute in all material respects similar to our own Uniform Airport Act of 1947 and containing a section virtually identical with sec. 24 hereinabove quoted in full. Plaintiff brought the action against the city, the county and others for the wrongful death of his intestate who appeared at the airport late at night to present himself as a passenger and was shot by a guard employed by the airport which was conducted jointly by the city and the county. The court first held that in the operation of an airport the county was acting in a proprietary as distinguished from a governmental capacity. In the North Carolina case, as in this case, the court remarked that the identical question before it was one of first impression in that jurisdiction, and we refer to the opinion in that case for its very careful discussion of the so-called airport cases decided in the various jurisdictions in this country as applied to the liability of municipal corporations, and for its conclusion that no case has been cited contrary to the holding that the construction, operation and maintenance of an airport by a municipality is a proprietary as distinguished from a governmental function, and that municipalities may be held liable in tort for the negligent operation thereof except where expressly exempted by statute. Turning its attention then to the liability of counties for such activities, the court said: "The appellants take the further position that a county in this jurisdiction is empowered only to perform governmental functions and, therefore, cannot act in a proprietary capacity."

After concurring in the view that a county when acting in its governmental capacity cannot be sued without legislative sanction and that ordinarily it acts only in a governmental capacity, the court said: "But when it undertakes, with legislative sanction, to perform an activity which is proprietary or corporate in character, such a county may be liable in tort to the same extent as a city or town would be if engaged in the same activity. And our statutes authorizing municipalities

to construct, operate and maintain airports are made applicable to counties by G.S. § 63–57, which reads as follows: '(a) The purposes of this article are specifically declared to be county purposes as well as generally public, governmental and municipal, (b) The powers herein granted to all municipalities are specifically declared to be granted to counties in this state, any other statute to the contrary notwithstanding.'

"It might be wise to exempt municipalities from tort liability in connection with the construction, operation and maintenance of airports, if so, we think the exemption should be expressly granted by the Legislature, rather than by judicial decree. Airports are here to stay and will be used extensively by the public in the future. However, transportation by air has not been developed to a point so as to make the construction, operation and maintenance of the average airport a profitable enterprise. · That is why private capital is not available for this purpose."

■ We agree with the North Carolina court that if immunity is to be granted, it must be accomplished by the legislature. Perhaps even more convincing than some of the reasoning of the North Carolina court are the provisions of the 1947 act authorizing agreements between two or more cities and counties defining the proportionate interest of each in the property, facilities and privileges, the duties and liabilities of each in the operation, including the assumption or payment of indebtednesses "arising from the joint venture," the operation of the joint fund into which all proceeds are put and from which all disbursements are drawn, etc. It is difficult to conceive of language which more aptly and more effectively places the county in precisely the same position as the municipality in the operation of such joint enterprise of maintaining and operating an airport. The entire structure of such a joint enterprise would fail if as a matter of law the municipality would be liable for its torts while the county would not.

■ Respondent contends that the very wording of

the 1947 act declaring that the operation of the airport should be deemed to be in furtherance of a public and governmental function is a declaration of sovereign immunity.[3] Replying to a similar contention the Supreme Court of North Carolina on rehearing in Rhodes v. City of Asheville, 230 N.C. 759, 53 S.E.2d 313, said: "We cannot attribute to the language used the force and effect urged by appellants. Instead, we must construe it in such manner as to bring it within the legislative authority of the General Assembly and make it consistent with the validity of the statute in which it is used. This is in accord with the applicable rule of construction."

Such rule of construction has been enunciated on many occasions by this court. The reference to the apparent purpose of the declaration that airport operation is a public and governmental function as being to support the validity of the statute, is undoubtedly directed to the general rule restricting the activities of counties to public and governmental purposes as subdivisions of the state. Like the North Carolina court, we believe the declaration to be simply in justification of the powers granted. As applied to statutes creating municipal corporations, each of the three separate opinions of the justices of this court in Pardini v. City of Reno, 50 Nev. 392, 263 P. 768, recognized the rule that exemption from liability cannot be claimed unless it is clearly and expressly given. In this view we find it unnecessary, for the purposes of this case, to adopt the further holding of the North Carolina court that the determination of what is or what is not a governmental function is a judicial question which can in no event be determined by the legislature.

[3]Thus giving to the statutory declaration of governmental and public function as great an effect as the Tennessee statute, which, after declaring such function, went on to provide: "* * * and no action or suit shall be brought or maintained against any municipality, or its officers, agents, servants or employees, in or about the construction, maintenance, operation, superintendence, or management of any municipal airport." Stocker v. Nashville, 174 Tenn. 483, 126 S.W.2d 339, 124 A.L.R. 345.

In justice to the learned district judge we must say that his opinion does not indicate that the Rhodes case was ever called to his attention. This is probably due to the fact that his opinion is dated July 21, 1949. The Rhodes case was first decided March 23, 1949, and the rehearing denied May 11, 1949, and it is quite possible that the case did not come to the attention of the court, perhaps not to the attention of counsel when this case was argued below.

Despite the fact that appellant's opening brief discussed Rhodes v. Asheville at length as being the only reported case on all fours with the present appeal, respondent's answering brief ignored the case entirely. Likewise as to Henderson v. Twin Falls County, 56 Idaho 124, 50 P.2d 597, 101 A.L.R. 1151. Respondent simply comments that the case is poorly reasoned, was decided by a divided court, and that the dissenting opinion relied upon McKay v. Washoe General Hospital, 55 Nev. 336, 33 P.2d 755, 36 P.2d 78. We do not think the Idaho case poorly reasoned and we think the dissenting opinion misconceived the effect of the McKay case.

■ We hold that Douglas County was authorized by statute, in its discretion, to engage in the airport business in its proprietary capacity, and, having so engaged, was not protected by the rule of sovereign immunity from liability for its torts in that capacity; and that the statutory declaration that such activity, if entered into, was a public and governmental function, for a public purpose, and a matter of public necessity, was not equivalent to a declaration of immunity.

The judgment dismissing the action as to respondent Douglas County is reversed, and the cause is remanded to the district court for the entry of an order by that court overruling respondent's demurrer to appellant's complaint and directing respondent to serve and file its answer thereto within such time as may appear proper. Appellant is allowed its costs.

HORSEY, C. J., and EATHER, J., concur.

ON PETITION FOR REHEARING

August 1, 1950.

*Per Curiam:*

Rehearing denied.