No. 31,968

BETTY McGINLEY, a Minor, by CLARENCE McGINLEY, Her Next Friend, *Appellee*, v. THE CITY OF CHERRYVALE, *Appellant*.

(40 P. 2d 377)

Opinion filed January 26, 1935.

*C. W. Mitchell* and *James A. Brady,* both of Cherryvale, for the appellant.
*Sullivan Lomax,* of Cherryvale, *W. N. Banks, O. L. O'Brien* and *Walter L. McVey,* all of Independence, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: Betty McGinley, about twelve years old, was riding in an automobile driven by her father, and the superintendent of the city waterworks, Guy Baker, driving at high speed, struck the automobile in which the plaintiff was riding, and as a result her leg had to be amputated below the knee. She obtained a judgment for $15,000, which was reduced by the district court to $12,000. The city appeals.

Betty McGinley had been assisting her father, brother and sister to drive calves to a pasture a short distance from home. Her mother came in a model "T" Ford coupé to take them home. The father was sitting at the left, driving, the mother sat in the middle holding a two-year-old baby on her lap; a sister, Frances, sat between the mother and the right-hand door; a brother, Frank, aged ten, stood on the left running board, and the plaintiff stood on the right running board. The car was being driven on a north-and-south road at a speed of fifteen miles an hour on a well-traveled gravel road and where it intersected another gravel road running east and west. It appeared that the father started to cross the intersection, looked for approaching cars, and, seeing none, drove slowly into the intersection, and when he got to the middle he saw a Ford truck approaching about 120 feet away. He then put his car into high, but the truck crashed into his car before he could escape.

It appears that the truck was driven by Guy Baker, the water-works superintendent of the city of Cherryvale, who was going to the pumping station of the city located about one mile farther west on the Verdigris river. He was driving a truck owned by the city and was going out to look at and repair the pumps of the station which supplied the city with water, owned and operated by the city. The front end of the truck struck the right rear side of the coupé, crushing the right rear wheel and crushing the plaintiff's leg so that is was necessary to have it amputated.

It was admitted that Baker was the city's water superintendent, that the station on the Verdigris river was a part of the plant, and was also operated by Baker, who, at the time stated, was on his way to the pumping station to care for it.

It is claimed that the award was excessive. It was $15,000 and the court after consideration reduced it to $12,000. There is a claim that riding on the running board was contributory negligence. It would be a question for the jury to decide whether it was negligence to ride there.

The first question, Was the city liable for an accident involving negligence which occurred on the highway between the plant in the city and the river, which was several miles away? The power to operate a waterworks system outside of the city limits is expressly given by statute, carries with it the power to send employees out over regularly used highways to build, repair and operate it. It was unnecessary to buy and make a highway parallel with the public highway to be used by the city. The city had power to control the superintendent's acts while going out to and performing the functions at the pump house. The jury said that the superintendent was negligent in that he was not watching the road when and where the accident occurred.

The appellant contends that the city was not liable for injuries occurring outside the limits of the city, or when carrying out one of its authorized functions the agent exceeds his authority. Cherryvale is a city of the second class and may act in its private proprietary capacity, and also in its governmental capacity. Good water cannot always be obtained within a city's corporate limits and many have to go outside of the corporation to secure it, and authority is given to a city to go beyond the city limits for it. (R. S. 12-842. See, also, *Evel v. City of Utica*, 103 Kan. 567, 175 Pac. 635.)

Cases are cited to show that steps taken by a municipality without authority, or which were *ultra vires*, are open to challenge, but the authority being given, these authorities are not applicable here or controlling. When the city found water near the Verdigris river about five miles from the city and laid pipes through which water was forced into the city, a pumping station was erected there and the station was under the supervision of Guy Baker, the superintendent of the entire plant, inside and outside of the corporate limits. He admitted that he was going to the pumping station to care for it just as he would have done had it been in the city limits.

In 64 A. L. R. 1545 there is an annotation in which the rule of recovery is well stated:

"The general rule is that where a municipal corporation is performing a public or governmental function, from which it derives no profit or advantage, it is not responsible for the negligence of its officers in respect to this function (19 R. C. L. 1108); but that, where it is functioning in its private or proprietary capacity for the profit, benefit, or advantage of the corporation or the people who compose it, rather than for the public at large, it is liable for the negligence of its employees to the same extent and under the same conditions as a private corporation. (19 R. C. L. 1109.)"

This rule has been practically adopted and applied in Kansas. In *Freeman v. Chanute*, 63 Kan. 573, 66 Pac. 647, it was said:

"There are two kinds of duties which are imposed on a municipal corporation—one arising from the grant of a special power, in the exercise of which the municipality is a legal individual; the other arising from the use of political rights under the general law, in the exercise of which it is a sovereign. The former power is quasi-private and is used for private purposes; the latter is public and used for public purposes. . . . In building its waterworks, gas, electric-light plants, sewers, and other internal improvements which are for the exclusive benefit of the corporation, it is in the exercise of its quasi-private power and is liable to the same extent as are private corporations." (p. 577.)

In the case of *City of Wichita v. Railroad & Light Co.*, 96 Kan. 606, 152 Pac. 768, it was said:

"It is well recognized that every municipal corporation exercises dual functions: One in its capacity as a governmental body; the other in its proprietary capacity. Plaintiff's right under the ordinance and laws to be paid a percentage of the defendant's receipts is a proprietary right and not one inhering in the exercise of governmental power. In this respect its rights are governed by the same rules that apply to contracts made by an individual or a private corporation." (p. 608.)

In *McCormick v. Kansas City*, 127 Kan. 255, 273 Pac. 471, the rule is recognized and it was held that the city was conducting a

business or trade for gain and that although employment was also related to a portion of the city's business which was governmental, the rule of liability was applied.

The court has held in *State v. Water Co.*, 61 Kan. 547, 60 Pac. 337, that—

"Corporations cannot sell or mortgage those franchises received from the state which confer power upon them to exist as artificial bodies; but those franchises denominated as secondary, which include the privileges granted by a city to a water company, with the right to take tolls, etc., may, under our statute, be lawfully alienated or encumbered." (Syl. ¶ 2.)

This view is supported by most of the authorities where the rule is mentioned or has been approved. In every case the rule is applied that a municipality is liable the same as private parties where it engaged in supplying its citizens with water for which it collects from the users the value of the same. The profit, benefits and advantages which it takes from its citizens mark it as being done in a proprietary capacity, and it is then liable for the negligence of its employees to the same extent as a private corporation.

It is contended that Guy Baker, in driving to the pump station, was not acting within the scope of his authority when the collision occurred. The petition alleged that Baker was the city superintendent in charge of the pumping plant, that it is necessary for a skillful employee to visit the plant as often occasionally as once a day, and it was the duty of Baker to see that the pumps were oiled and in good working condition. That he used a Ford truck owned by the city, going to and from the plant. It is alleged that on the 11th of May, 1933, when the McGinleys had finished placing the calves in the pasture and were returning home at a moderate rate of speed, the plaintiff did not see the defendant's car when they entered the intersection. They looked for it, but it was not to be seen and was not seen until they reached the center of the intersection, when the plaintiff noticed the car and waved to the driver, but he paid no heed to her or was not watching the road and did not see her motion. The petition alleged that there was ample room to have passed south of the McGinley car without striking it; that there was room by turning to the north to have passed down near the center and have avoided the collision.

Baker admitted that he was on his way to the pumping station, admitted that the accident was the result of his own negligence, and about a month afterwards he told Mr. McGinley that—

"Well, he told me that he was going to the pumps, that they had been giving him trouble, he said he had been working overtime, day and night, and his mind was not really on his driving when they approached that corner, but it was on his work, and he said when he looked up he done just what he hadn't ought to have done."

This question was answered without objection. Near that time he came up where Mrs. McGinley was and he said:

"I don't know how sorry I am about this accident, he said whatever made me turn into that child, I don't know, he said I had the whole road, it could have been avoided altogether, he said I just lost my head, I didn't see you at all, I just lost my head and turned into you."

Some objection was made after this conversation was received, but the court overruled it. The objection was that he couldn't prove agency by the testimony of the agent. That, however, was an admitted fact and was not offered for the purpose of showing agency.

There were several special questions asked and among them the thirteenth, which is as follows: "If you find for the plaintiff, in what respect do you find the defendant, its agents or servants, negligent?" And the answer was, "Not watching the road." If he had been watching the road he could have avoided the collision. The question was proper and might have been answered in more detail, stating the particular acts of negligence which resulted from not watching the road.

In *Hancock v. Bevins*, 135 Kan. 195, 9 P. 2d 634, it was held that under the allegations the negligence could consist of too great a speed at a crossing, failing to look ahead and observe the condition of the highway at the crossing, and to have the taxicab under control by the use of brakes, all of which the jury summed up in the expression "careless driving." The finding of course should properly have named one or more of the items as alleged, if supported by the evidence, but the court observed that by applying to these two words their everyday significance, they convey to us a plain and unmistakable intention to embody the elements of speed in driving without looking ahead to observe the dangers. The finding is in accord with the general verdict and is not inconsistent with it and hence it was at least not prejudicial error.

In *Leinbach v. Pickwick-Greyhound Lines*, 138 Kan. 50, 23 P. 2d 449, it was said:

"It is the duty of the court to read special findings together, and to interpret them in such a way they may be harmonized, when that can be done.

Likewise it is the duty of the court to harmonize special findings with the general verdict, when that can be done. Construed as indicated, there is no conflict between the special findings." (p. 58.)

Here there was no inconsistency in the findings with the general verdict. See, also, *Coffman v. Shearer*, 140 Kan. 176, 34 P. 2d 97.

The claim that the agent was not acting within the scope of his authority is without merit. All of his pertinent duties were admitted. He was traveling by the usual and direct route from the city to the pumps and there was no occasion to question by what right he was on his way to the pumps, going by the most direct route, a public highway. The highway was for the use of all the public. It was unnecessary for the city to build and own a parallel road along the side of the public highway which its agent was entitled to use to reach the pump part of the plant.

Another ground of complaint is that the award is excessive. The jury found that plaintiff was entitled to $15,000 damages. This was deemed excessive by the district court, who reduced it to $12,000. Our view of the circumstances in the record and the conditions prevailing, is that that amount is still excessive, and while no error is otherwise committed, we find the judgment will be reversed unless the plaintiff is willing to accept $9,000 as damages, and if accepted it will be affirmed. If not accepted the judgment will be reversed and a new trial had on the amount of damages only.

It is so ordered.