No. 35,283

A. A. SHOEMAKER, *Appellant*, v. THE CITY OF PARSONS, J. A. LAWRENCE and BAILEY RICKETTS, *Appellees*.

(118 P. 2d 508)

Opinion filed November 8, 1941.

*A. L. Foster*, of Parsons, for the appellant.

*Earl Bohannon, Stuart T. McAlister* and *J. L. Shuss*, all of Parsons, for the appellees.

The opinion of the court was delivered by

SMITH, J.: This was an action for the wrongful death of the son of plaintiff. Judgment was for the defendants sustaining a demurrer to the petition. The plaintiff appeals.

The petition, after alleging the formal matters as to residence and the official capacity of defendants, alleged that on July 28, 1940, the city of Parsons was the owner of a swimming pool; that the swimming pool was operated under a contract between the city and defendants Lawrence and Ricketts.

The petition then alleged that the pool was 150 feet north and south and 75 feet east and west; that it was so constructed that when full the water was nine feet deep at the north end and the floor sloped southward and downward to a point fifteen feet distant from the north end where the water was nine and one-half feet deep; that from this point the floor sloped southward and upward to a point 40 feet from the north end where the water was about five feet deep, and from this point the floor sloped upward to the south end of the pool where the water was two and one-half feet deep.

The petition then alleged that a point in the floor of the pool fourteen feet south of the north end and thirty-three feet, ten and one-half inches east of the west side of the pool was a circular outlet thirteen inches in diameter covered by a rectangular iron gate sixteen inches square; that at a point fourteen feet south of the north end and thirty-three feet, eight inches, west of the east side of the pool was another outlet of the same size and structure and that there were no other outlets. It should be noted that according to the above dimensions these two outlets were fourteen feet from the north end of the pool and only a foot or two apart, and were located just about where the water was deepest.

The petition then alleged that at each end within five feet of each corner below the surface of the water located in the wall was an inlet, making two at each end, four inches long by three inches wide. It should be noted that two of these inlets were about 135 feet from the outlets and that two of them were fifteen feet or more from the nearest outlet.

The petition then alleged that the pool had a capacity of approximately 375,000 gallons of water; that this water was in constant circulation through these outlets at the rate of 660 gallons or 20.95 barrels per minute and was received back through the inlets at the same rate; that in the center of this pool at the north end and projecting over the water approximately five feet and approximately ten feet above the water was a diving tower. This would put the end of the diving tower about nine feet from the point where the outlets were located and in the deepest part of the pool.

The petition then alleged that the pool was being operated on the day of the injury.

The petition then alleged that the swimming pool so constructed and so operated in a negligent manner constituted a hazard in that these inlets and outlets and the circulation of the water caused excessive and unreasonable force, currents, pressures and suctions in the water which generated great pressure and force downward toward the floor of this pool, particularly in the vicinity of these outlets which were negligently, carelessly and unskillfully constructed and located closer to this diving tower than was reasonable, prudent and proper; that the city was negligent in installing an insufficient number of outlets and improperly locating them, so they could not accomplish their purpose without creating a dangerous condition in the pool; that at all times Lawrence and Bailey Ricketts had complete knowledge of all these facts and they were negligent in operat-

ing and permitting to be operated this swimming pool knowing as they did that the construction and operation of the pool constituted a hazardous and dangerous condition.

The petition then alleged that on July 28, 1940, the son of plaintiff, who was then 37 years old, paid the admission price, put on his bathing suit, and while exercising reasonable care and prudence, dived from the diving tower into the water below, and due to the improper, negligent, careless and dangerous construction of the swimming pool and due to the improper, unreasonable, negligent and careless operation of this pool, struck the bottom of this pool with his head, sustained a broken neck and died of the injury; that he relied on the resistance and buoyancy which the water when properly confined or properly circulated in a swimming pool offers to the human body in the process of diving or swimming, and that defendants owed him the duty to so operate and maintain the pool; that the improper, negligent and dangerous construction and operation of the pool was the proximate cause of his death.

The petition then made allegations as to the damage the father had sustained, which allegations are not of interest to us at this time.

The petition then alleged that Charles E. Shoemaker came to his death through the negligence of defendants in the following particulars:

"1. In failing to provide and equip said swimming pool with a sufficient number of outlets and inlets, of adequate size and proportions, and in operating said pool so negligently and inadequately constructed.

"2. In failing to properly locate said outlets and inlets in said pool and in operating said pool under conditions thereby created.

"3. In failing to cover said outlets with grating of proper area and proportions; and in operating said pool notwithstanding the conditions created thereby.

"4. In so constructing and operating said pool as to destroy the resistance and buoyancy which water usually and ordinarily has when properly confined in a swimming pool under reasonable and proper conditions and operations, having due regard for safety of the life and limb of users thereof.

"5. In circulating the water in said swimming pool at such a rapid rate as to create currents and pressures in said pool of such proportions and degree as to endanger the life and limb of swimmers and divers using said pool.

"6. In failing to provide a reasonably safe place for swimming and diving after having undertaken to do so.

"7. In so constructing and operating said pool as to destroy the resistance and buoyancy which swimmers and divers in the exercise of due care, skill, reason, and prudence have a right to expect from water properly confined or properly circulated in a swimming pool.

"8. In failing to provide lifeguards at such swimming pool and to adequately supervise the operation of said pool and to exercise due care for the safety of the life and limb of persons using said pool. All of which defendants were duty bound to do and decedent as a reasonably prudent person had a legal right to rely upon their so doing."

There was a paragraph (No. 16½) attached to this petition by means of rider in the way of an amendment introducing into the case the theory of *res ipsa loquitur*, but the trial court required plaintiff to elect whether he would rely for recovery on the specific acts of negligence or on the doctrine of *res ipsa loquitur*. He elected to rely on the specific acts of negligence already set out here, hence paragraph 16½ was stricken from the petition.

To this petition was attached the agreement in writing between Lawrence and Ricketts and the city. This agreement gave Lawrence and Ricketts the right to operate the pool and the concessions with it. The city agreed to furnish the necessary water, current and power and electric lights and chemicals. Lawrence and Ricketts agreed to furnish lifeguards. There were two paragraphs of the contract to which plaintiff calls particular attention.

"3. In consideration for the granting by the party of the first part to the parties of the second part the rights and privileges herein provided, said parties of the second part agree to operate said swimming pools in season and to pay to party of the first part fifty percent (50%) of the gross receipts derived from the sale of admission tickets to the swimming pools, and said payments shall be made to the city clerk of said city on Monday of each week and be accompanied by a statement of the receipts from the sale of admission tickets.

"It is further agreed that the parties of the second part shall sublease to a responsible party or parties the concessions herein provided for at a reasonable rent and shall pay to party of the first part herein as a part consideration for said grants fifty percent (50%) of the amount received for the rental of said concessions."

The plaintiff also refers in particular to a clause in this contract which required the parties operating the pool to carry a standard liability insurance policy covering the pool, indemnifying the parties from any loss or damage which might be sustained by reason of the operation of the pool.

To this petition the defendant city and the two defendants who are operating the pool interposed general demurrers on the ground that it did not state facts sufficient to constitute a cause of action against any of them. These demurrers were sustained—hence, this appeal.

The trial court decided the case on the theory that it was controlled by the rule announced so many times in this court that

maintaining a swimming pool in a park is a governmental function and a city is not liable for the negligence of its officers in carrying on a governmental function.

Plaintiff argues here that in this case the city was not operating the pool in its governmental capacity but in a proprietary capacity. He bases this argument in the main on the two clauses of the contract which have been heretofore set out in this opinion. These clauses provided that the city should receive fifty percent of the gross receipts from the sale of admission tickets to the pool and the amount received from the rental of concessions. He argues that under the provisions of these two clauses the city was operating the pool for profit and was engaged in a private enterprise in its proprietary capacity. He argues further that the provision of the contract requiring the taking out of the insurance was a part of that plan.

The fact that the parties saw fit to provide that the persons operating the pool should reimburse the city on the basis of fifty percent of the gross receipts did not of necessity constitute the affair a profit-making enterprise.

The contract provided that the city should provide water, electric current and chemicals necessary to keep the pool in operation. It does not appear either in the petition or the contract that the taking of this fifty percent enabled the city to make a profit. Furthermore, should there have been a profit incidental to the operation of the pool such would not constitute the transaction a proprietary rather than a governmental one. (See *Bailey v. City of Topeka,* 97 Kan. 327, 154 Pac. 1014.) The manner in which the details of the business of paying for the right to operate the pool are managed is not the controlling element. The test is whether the activity is carried on for the use and benefit of the general public. Applying this test, we have held many times that swimming pools operated as this one were operated for the use and benefit of the general public, and that the city was not liable for the negligence of its officers in carrying on such an activity. (See *Gilliland v. City of Topeka,* 124 Kan. 726, 262 Pac. 493, also *Warren v. City of Topeka,* 125 Kan. 524, 265 Pac. 78, *Swan v. Riverside Bathing Beach Co.,* 128 Kan. 230, 276 Pac. 796.)

Plaintiff next argues that conceding for the sake of argument that the city was operating this pool in its governmental capacity, this petition stated a cause of action against it because it alleged that the

city built and leased a swimming pool, which on account of its defective and improper construction was inherently dangerous to the people using it.

Plaintiff relies upon the general rule that where a city adopts a plan which all persons of reasonable prudence and intelligence would agree was unsound, it will be civilly liable for the consequences. This is but another way of stating the rule that a city may be liable for an injury resulting from a nuisance created or maintained by it even though the nuisance was created by the city in the exercise of its governmental functions. We must examine this petition to see whether it describes a plan of a swimming pool which all persons would agree was unsound or dangerous; in other words, a nuisance. In examining this petition we will note that many of the allegations contained in it are conclusions of the pleader. We shall consider only the pleadings of facts.

First, a diving tower ten feet above the water; the water nine and one-half feet deep; the two outlets each about thirty-three feet from the sides of the pool or approximately in the middle of it and almost directly in front of the diving tower and about nine feet out in the pool from the end of the diving tower; water going through these outlets at the rate of 660 gallons a minute, and an allegation that this created a suction at that particular point which deprived the diver of the benefit of the natural buoyancy of the water, and caused his body to go through the water more swiftly than it otherwise would have, and to strike the floor of the pool so hard as to break his neck.

The outlet had to be in the deepest part of the pool so that the water would run out, but the particular hazard which the petition alleges caused the death of the son of plaintiff could have been avoided by changing the location of the two outlets. Was a pool arranged according to such a plan a nuisance? In *Sroufe v. Garden City*, 148 Kan. 874, 84 Pac. 845, the city had left the grating off the outlet pipe in a swimming pool while draining it and the son of plaintiff while playing in the pool was caught in the pipe, held there by the force of the outflowing water, and drowned. This court held that the city was maintaining the pool as a governmental function. The plaintiff conceded this to be the rule, but contended that the city in operating the pool as it was operating it was maintaining a nuisance and was liable. This court held that the doctrine of attractive nuisance was not helpful to plaintiff. This court in that opinion re-

ferred to *Gorman v. City of Rosedale,* 118 Kan. 20, 234 Pac. 53. In that case the city had undertaken to change the course of a stream and in so doing dug a tunnel through which the stream flowed. The son of plaintiff was drowned. The plaintiff sought to fasten liability on the city because the tunnel was negligently constructed in several particulars which caused the boy's death. This court held that the work of building and maintaining the tunnel was governmental and that the city was not liable even if the negligence of its officers had been established. This court refused to give the plaintiff the benefit of the doctrine of attractive nuisance. To the same effect is *Bruce v. Kansas City,* 128 Kan. 13, 276 Pac. 284. In *Gilliland v. City of Topeka,* supra, the theory upon which the plaintiff sought to place liability upon the city was attractive nuisance, alleging among other things the sloping bottom of the pool. The danger from the sloping floor could have been dealt with by a different type of construction. This court said:

"Plaintiffs stand on the proposition that the swimming pool with its equipment and appurtenances was a nuisance attractive to children, and consequently that the city may not avoid liability by invoking the doctrine of exercise of governmental power in maintaining the swimming pool.

"The swimming pool was doubtless attractive to children, but it was not a nuisance, producing public annoyance, inconvenience, discomfort or hurt." (p. 726.)

In *Warren v. City of Topeka,* supra, two young girls were drowned in a swimming pool. In the action to recover damages the petition alleged, amongst other things, that the pool was built with a drop-off of about four feet without suitable warning or danger signal for protection. Amongst other things it was argued that this manner of constructing the pool constituted a nuisance. This court held against this proposition and quoted from *Gilliland v. City of Topeka,* supra.

The rule has been elsewhere stated that if the natural tendency of the act complained of is to create danger and inflict injury on person or property, it may properly be found a nuisance as a matter of fact; but if the act in its inherent nature is so hazardous as to make the danger of extreme and serious injury so probable as to be almost a certainty it shall be held a nuisance as a matter of law.

After an examination of the opinions wherein we have passed on the question of liability of cities for deaths from drowning in swimming pools, where leaving the grating off the drain pipe, or the maintaining of a sudden step-off or steeply sloping floors in swimming pools, have been held not to constitute a pool a nuisance, we

have concluded that the manner in which this swimming pool was constructed was not such as to constitute a question of fact as to whether this pool was a nuisance, and the demurrer was properly sustained as to the city.

There remains the question as to whether the demurrer was properly sustained as to the two parties who were operating the pool. The answer to this question turns upon whether the immunity of the city from liability must be imputed to the parties who were operating the pool under the contract with the city.

The answer to this question turns upon whether the parties were operating the swimming pool as employees or agents of the city or as independent contractors.

Defendants rely upon *Kern v. Newton City Commissioners,* 151 Kan. 565, 100 P. 2d 709, to sustain in their argument that in this contract between the operators and the city they were the agents of the city. That was a case where a young colored boy had brought a mandamus action against the city and the lessee of the pool to compel them to permit him to use it. The city stated it had leased the pool to the operator, it was being operated under that lease, and argued this placed upon the lessee the sole obligation of deciding who should use the pool. This court held that the fact that the pool was being operated under a lease from the city to the operator did not change the obligation of the city, and that it would not do to hold that by such an arrangement the city officials could relieve themselves of their duty to see that the pool was operated without discrimination as to race.

In *Warren v. The City of Topeka,* supra, this court examined the question of the liability of the operator of that pool. We do not have the benefit of the contract in the Warren case. However, this court stated as to it that it could more properly be called a concession from the city to the operator than a lease. This court referred to the case of *Bailey v. City of Topeka,* 97 Kan. 327, 154 Pac. 1014, and stated that there was apparently a similar agreement in the Bailey case and that in the Bailey case it was said that—

"The concessions granted do not amount to the leasing of any part of the park . . . nor do they involve the loss of control over it by the public ·officers." (p. 329.)

The court then said that if the operator of the pool did not have a lease, but only a concession, with absolute supervision and control

to be exercised over him at all times by the city and its officers he could not be said to be an independent contractor. Thus the holding that a cause of action was not stated against the operator of the pool in the Warren case turned upon a construction of the instrument under which the pool was being operated.

In the case of *Swan v. Riverside Bathing Beach Co.*, supra, we do not have the benefit of the agreement. That case was brought against the Bathing Beach Company, which was operating the pool, but not brought against the city. This court examined the contract which was attached to the opinion as an appendix, and held that it was clearly a lease distinguished from the instrument in the Warren case, and held the Bathing Beach Company liable.

Since we have the instrument in that case before us and the instrument in the present case before us it is possible for us to make a comparison of them. The instrument in the Swan case provided that the city did "lease" certain ground to the defendant for the purpose of enabling defendant to build a swimming pool thereon. The instrument then contained provisions pursuant to which the pool was operated by the defendant. The word "lease" is not used in the instrument in the present case. However, the instrument might be a lease even though the word "lease" was not used, the effect of the instrument being more clearly the criterion than the precise words used. The question turns upon whether the city retained any right to supervise the operation of the pool. When we apply that test we find that the city of Independence retained as much control over the operation of the pool in the Swan case as the city of Coffeyville did in this case, that is, both parties agreed to operate the pool in a sanitary manner according to law. Both instruments provided prices except in the Swan case the actual prices are provided for and in this case the maximum prices are provided for. In the Swan case the defendant was to build the swimming pool according to a plan which was to be submitted to the city commissioners. In this case the pool was already built when the defendant entered upon the operation of it.

Applying this test, we have concluded that the operators of this pool were independent contractors and hence liable as any other person for their negligence.

It will be noted that one of the specific acts of negligence with which plaintiff charged defendants was as follows:

"In circulating the water in said swimming pool at such a rapid rate as to create currents and pressures in said pool of such proportion and degree as to endanger the life and limb of swimmers and divers using said pool."

By the above allegation the plaintiff charged the defendants with negligent operation of the pool as distinguished from negligent construction.

There was no provision in the contract that bound the defendant operators to circulate the water at such a rapid rate.

The question of whether this was a violation of the duty owed by the defendant operators to individuals who used the pool and whether the operators are liable for the damage caused plaintiff on account of it is for the jury.

The judgment of the trial court sustaining the demurrer of the city to the petition is affirmed; the judgment of the trial court sustaining the demurrer of the two defendants operating the pool is reversed with directions to proceed with the trial of the action.

THIELE, J. (dissenting in part): I agree with that portion of this court's opinion affirming the trial court's ruling on the defendant city's demurrer to the petition. I dissent from that portion holding that a cause of action was stated against the individual defendants. There is no allegation the individual defendants operated the pool or circulated the water in it in any manner other than according to the original design. They are not to be charged with defective design, if in fact there was any, and they are not charged with circulating the water faster than the equipment was designed to operate. So far as the petition shows they were merely agents of the city operating the plant and its equipment in the manner in which it was designed to operate.

I am authorized to say that Mr. Justice HARVEY concurs herein.