No. 40,598

Leo Wendler, *Appellee*, v. The City of Great Bend, Kansas,
*Appellant*.

(316 P. 2d 265)

Opinion filed September 27, 1957.

*William I. Robinson,* of Wichita, argued the cause; *Barton Carothers,* of Great Bend, *Mark H. Adams, Charles E. Jones, J. Ashford Manka, Clifford L. Malone* and *Mark H. Adams II,* all of Wichita, were with him on the briefs for appellant.

*Leroy Warner,* of Wichita, argued the cause; *S. R. Blackburn, Tudor W. Hampton, Jerry M. Ward* and *J. W. Hannah,* of Great Bend, were with him on the briefs for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: The question presented in this appeal is whether the operation of a municipal airport is a governmental function affording the municipality governmental immunity from tort liability in such operations.

This action comes before the court on appeal from a ruling of the lower court striking the defense of governmental immunity from the answer of the defendant, which the defendant contends is a meritorious defense.

In *Boettcher v. Criscione,* 180 Kan. 39, 299 P. 2d 806, this court

held that an order sustaining a motion to strike is appealable as a final order if it in effect deprives the defendant of a meritorious defense which, if supported by evidence, would defeat all or part of plaintiff's cause of action. (See, also, *Collins v. Richardson,* 168 Kan. 203, 212 P. 2d 302; *Hoffman v. Cudahy Packing Co.,* 161 Kan. 345, 167 P. 2d 613; and *Atherton v. Goodwin,* 163 Kan. 22, 180 P. 2d 296.)

Leo Wendler, appellee, will be referred to as the plaintiff, and the City of Great Bend, Kansas, appellant, will be referred to as the defendant.

The plaintiff was the owner of a Steerman aircraft, equipped with engine, spray tank and spray unit. He seeks to recover for the destruction of his aircraft in a fire on January 5, 1954, which destroyed Hangar No. 5 on the Great Bend Municipal Airport and the aircraft therein. Plaintiff's aircraft had been placed for shelter in the hangar on the airport, which was operated and maintained by the City of Great Bend.

Th plaintiff seeks recovery from the defendant on the ground of negligence alleging in his cause of action all of the necessary elements of the doctrine of *res ipsa loquitur.* Plaintiff alleged that he paid a good and valuable consideration and fee for the storage of his aircraft in Hangar No. 5.

The sole question presented to this court for determination by the parties must be decided on the basis of the pleadings. The judgment of the trial court was invoked on questions of law as applied to the well pleaded facts attacked by the motion to strike. For this purpose the well pleaded facts alleged must be taken as true and a court is not justified in reaching out to make additional facts a part of the pleadings under attack. (*White v. Thompson,* 181 Kan. 485, 312 P. 2d 612; see, also, *Whitaker v. Douglas,* 177 Kan. 154, 277 P. 2d 641; *Geier v. Eagle-Cherokee Coal Mining Co.,* 181 Kan. 567, 313 P. 2d 731; and *Wahl v. Walsh,* 177 Kan. 176, 277 P. 2d 623.)

The defendant contends that the stricken paragraphs of the answer alleged facts concerning the acquisition and operation of the municipal airport which establish that the City was operating the airport in its governmental, as distinguished from its proprietary, capacity on January 5, 1954, when the hangar was destroyed by fire.

The following facts are relied upon by the defendant, all of which

have been stricken.from the answer by the ruling of the trial court. The City of Great Bend acquired its airport by a deed dated December 15, 1947, from the United States of America, acting by and through the War Assets Administrator, under and pursuant to executive order and statutory authority and regulations. (50 U. S. C. A. App. Sup. [1944], § 1622 [g]; 11 F. R. 7427. The City's authority is found in G. S. 1949, 3-113.) The deed specifically provided that the transfer of the property was subject to the following restrictions, which run with the land:

"(1) That all of the property transferred hereby, hereafter in this instrument called the 'airport,' shall be used for public airport purposes, and only for such purposes, on reasonable terms and without unjust discrimination and without grant or exercise of an exclusive right for use of the airport within the meaning of Section 303 of the Civil Aeronautics Act of 1938 . . .

"(2) That the entire landing area, as defined in WAA Regulation 16, dated June 26, 1946, and all structures, improvements, facilities and equipment of the airport shall be maintained at all times in good and serviceable condition to assure its efficient operation, . . ."

By the acceptance of the deed (a photostatic copy of which was incorporated in the answer by reference) or any rights thereunder the City further assumed additional reservations and restrictions providing in substance as follows: That no portion of the facilities transferred would be used in such a way as would be a hazard to the usefulness of the airport for airport purposes; that aircraft of the United States of America would at all times have the right to use the airport in common with others; and that during the existence of any emergency declared by the President of the United States or Congress the Government would have the right to take over the entire airport. Further provisions of the deed provided that a breach of any of the reservations, restrictions or conditions therein contained may result in a forfeiture of the rights transferred at the option of the Government. The WAA Regulation heretofore cited provides in part as follows:

"It is hereby declared that the national interest requires the disposal of surplus airport property in such a manner and upon such terms and conditions as will encourage and foster the development of civil aviation and provide and preserve for civil aviation and national defense purposes a strong, efficient, and properly maintained nationwide system of public airports, and will insure competition and will not result in monopoly. It is further declared that in making such disposals of surplus airport property the benefits which the public and the Nation will derive therefrom must be the principal consideration and the financial return to the Government a secondary consideration. Airports

which are surplus to the needs of owning agencies may be essential to the common defense of the Nation or valuable in the maintenance of an adequate and economical national transportation system. In such cases and in accordance with the rules established herein such airports may be disposed of to State or local governments for considerations other than cash. . . ." (WAA Regulation 16 dated June 26, 1946, 11 F. R. 7427.)

The City of Great Bend paid no actual moneys to the United States of America for the acquisition of the airport. The primary consideration for the transfer was the continued use, maintenance and operation of the airport and the facilities thereon for airport purposes for the use and benefit of the public at large and the Nation.

The airport acquired by the City has been controlled and operated by it as an agent of the State of Kansas for the public and governmental uses of the citizens of this State and Nation, without regard to residence, and the operation of the airport as a whole, including the operation of the hangar which was destroyed by fire, was not for gain or profit to the defendant municipality or for the gain, profit or use primarily of the citizens and residents of the municipality.

It was alleged that the defendant has operated the airport in accordance with the terms and conditions of the grant to it by the United States Government for public purposes in the interest of fostering air commerce, both intrastate and interstate, and for the benefit of the public at large; that private, commercial, public and military aircraft have continually used the airport, and the facilities have been open to the public generally; and that since 1951 facilities of the airport have been available to Continental Airlines, which has operated regularly scheduled commercial flights to and from Great Bend, originating in Denver, Colorado, and Kansas City, Missouri, with connecting flights to Tulsa and Oklahoma City, Oklahoma.

In the operation, care and maintenance of said airport defendant made no charge for landing, parking, tie-down service or daytime sheltering of aircraft in the hangar destroyed by fire, and made only the following nominal charges for continuous sheltering of aircraft: $15.00 per month for all single engine aircraft; $22.50 per month for a twin engine Cessna aircraft, and nightly sheltering charges of $1.00 for single engine aircraft, $2.50 for twin engine Cessna and Beech type aircraft, and $5.00 for twin engine Lodestar and Douglas DC3 type aircraft. In addition, a charge of $10.00

per month was made for single engine aircraft placed in dead storage.

Since the inception of the operation of the airport the City operated and maintained it at a loss. The deficit had been met by the levying and collection of a tax from the citizens of the defendant municipality, and the defendant did not during the time in question, and at no other time, acquire, own or carry any insurance protection against loss by fire, either for the benefit of itself or any third party with respect to operation of said airport. The last allegation was made to negative any contention that the defendant may have waived its immunity in the maintenance and operation of the airport and hangar as one of its alleged governmental functions. (See, *Bailey v. City of Knoxville*, 113 F. Supp. 3 [D. C. E. D. Tenn., 1953]; also, G. S. 1955 Supp., 12-2603.)

All of the foregoing facts recited were alleged in the answer and stricken by the trial court.

The question of liability of local governmental units for their torts has its origin in the common law of England. Since the time when Lord Kenyon and his fellow judges decided the case of *Russell v. The Men Dwelling in The County of Devon*, 2 T. R. 667, 100 Eng. Rep. 359 (K. B. 1788) Willes, 74, 16 East, 305, sustaining a demurrer in an action on the case brought against the Men of Devon for damages to the plaintiff's wagon by reason of a defective bridge, thousands of decisions have been made casting lawyers and judges into a sea of utter confusion. The underlying philosophy suggested by Lord Kenyon was that "If this experiment (*i. e.*, an action against the county) had succeeded, it would have been productive of an infinity of action. And though the fear of introducing so much litigation ought not to prevent the plaintiff's recovering, if by law he is entitled, yet it ought to have considerable weight in a case where it is admitted that there is no precedent of such an action having been before attempted. . . ." Thus, on such slender grounds have rested thousands of decisions. Shadowy distinctions between "governmental" functions and "proprietary" affairs, between acts of the servants and acts of public corporate entities, between revenue-producing enterprises and those of a strictly gratuitous nature, have been used to decide cases, all without much rhyme or reason.

Also of ancient origin is the doctrine that immunizes the state itself from liability—the King can do no wrong; he cannot be sum-

moned to appear before himself in his own courts—a doctrine which was transplanted in modified form from the common law of England to this country. Textwriters and even some jurists have expressed bewilderment that this country should adopt the doctrine of sovereign immunity, particularly in view of the history of this Nation and recitals contained in the Declaration of Independence, where in America there is no king, where the chief of State was never sovereign, where from the beginning sovereign power resided in the people, and where the rights of the individuals against the State are fundamental legal principles. (See, 29 N. Y. U. L. Rev. 1321 [1954]—a Symposium of Governmental Tort Liability by E. Blythe Stason, Dean of Michigan Law School.)

Regardless of the origin and development of the principle of governmental immunity, it is clear that our courts have almost from the beginning denied tort immunity to municipal governments performing "proprietary" or "permissive" functions. (Fuller & Casner, *Municipal Tort Liability in Operation*, 54 Harv. L. Rev. 437 [1941]; Repko, *American Legal Commentary on the Doctrines of Municipal Tort Liability*, 9 Law & Contemp. Prob. 214 [1942]; Seasongood, *Municipal Corporations: Objections to the Governmental or Proprietary Test*, 22 Va. L. Rev. 910 [1936]; Smith, *Municipal Tort Liability*, 48 Mich. L. Rev. 41 [1949]; and Tooke, *The Extension of Municipal Liability in Tort*, 19 Va. L. Rev. 97 [1932].)

The State is usually deemed immune regardless of the kind of function it is performing. What justifies the difference between the State and its municipal subdivisions is baffling. The decisions seem to result from accident rather than from reason, and tend to make one question the entire rationale of the principle. For example: Consider the liability of a city to a pedestrian injured by the negligence of a city employee operating a pick-up truck under the supervision of the Water Department, and the non-liability of a city on the same facts where the truck is under the supervision of the Fire Department.

Generally, municipal corporations are not liable for negligent acts while in the discharge of their political or governmental functions as branches of the State or sovereign power, but they are liable for their negligence while exercising their private, proprietary or corporate right, the true test of liability being not the nature of the tort, or the relationship existing between the City and the person injured, or whether the City was engaged in the management of

tangible property, but in what capacity the City was acting at the time. We therefore regard the nature of the operation, rather than the manner in which the Great Bend airport facility was acquired, as controlling in the instant case.

This question has not only been prolific of litigation in the United States but in the State of Kansas as well. In *Perry v. City of Wichita,* 174 Kan. 264, 255 P. 2d 667, Justice Wedell, speaking for the court, said:

". . . Before considering our own cases it should be frankly conceded there is considerable divergence of opinion among courts and textwriters relative to whether certain activities of cities constitute governmental functions or functions interchangeably referred to as proprietary, corporate and municipal. Some difference of opinion also obtains concerning the liability of cities when exercising either function. It would constitute a futile effort to attempt to harmonize the decisions as different courts have reached contrary conclusions on the same or highly similar facts. . . ." (p. 268.)

It must be conceded that Kansas has firmly adopted the doctrine of governmental immunity where the functions of a municipality are performed in its sovereign capacity, yet the historical origin of the rule has led this court to recognize that the trend of judicial decisions generally is to restrict rather than to expand the doctrine of municipal immunity. (*Krantz v. City of Hutchinson, et al.,* 165 Kan. 449, 196 P. 2d 227.)

As a preface to further discussion herein, specific reference is made to the opinion of this court speaking through Justice Hoch in the *Krantz* case. There, many cases were circumvented by setting forth various text rules in an effort to show some consistency in the law on the subject, where conflict of authority on the proposition was readily conceded. An attempt to further elaborate thereon would be futile.

It should be emphasized that the carefully worded opinion in *Krantz* does not lay down any one rule which the court recognizes as the guide or distinguishing characteristic or test to determine whether a given activity of a municipality is governmental or proprietary. Note particularly Syllabus No. 4 which reads as follows:

"*One distinction frequently stated* is that governmental functions of a municipality are performed for the general public, with respect to the common welfare and for the exercise of which it receives no compensation or particular benefit, while its proprietary functions are exercised for some specific benefit or advantage to the corporation or those comprising the local urban community." (Emphasis added.)

In the *Krantz* opinion the court said:

"In its public or governmental capacity, the municipality partakes of the sovereignty of the state. It acts as a sort of arm of the state, and as such exercises the limited governmental powers granted to it by the state.

"Among typical *governmental* functions of a municipality may be mentioned: Assessment and collection of its proportion of the state tax, police regulations, suppression of crime, protection of the public health, the exercise of eminent domain, operating a fire department, administration of justice.

"In 43 C. J. 182, 183, it is said that:

" 'When properly applied the term *"governmental* functions" should be limited to *legal duties imposed by the state upon its creature,* which it may not omit with impunity but must perform at its peril.' (Italics supplied.)

"and that these governmental functions are those that are *exercised for the public good, generally,* and 'for the exercise of which the municipality *receives no compensation or particular benefit.'* (Italics supplied.)" (p. 454.)

The defendant in an effort to establish immunity relies on the theory that the City is operating as an arm or agent of the State and the test set out in Syllabus No. 4 of *Krantz*—citing *Shoemaker v. City of Parsons,* 154 Kan. 387, 118 P. 2d 508; *Stolp v. City of Arkansas City,* 180 Kan. 197, 303 P. 2d 123; *Krantz v. City of Hutchinson, et al.,* supra; *Perry v. City of Wichita,* supra; and *Rose v. City of Gypsum,* 104 Kan. 412, 179 Pac. 348.

While it is true that under a given set of facts and circumstances the test relied upon by the defendant has been given as controlling in a particular decision, a reading of all of the foregoing cases cited together with the cases cited therein does not indicate an absolute reliance by this court upon any single test or rule.

The plaintiff, on the other hand, relies upon a more general test, namely, whether the municipality is performing a "permissive" or a "mandatory" function of government.

The issue before this court is one of first impression.

Persuasive is the fact that we have found no decision, and the defendant has cited none, in which any court of last resort in this country has held the operation and maintenance of an airport by a municipality to be a governmental function affording the municipality governmental immunity from tort liability in such operations, except where the municipality has been *expressly* exempt from such liability by statute. Express exemption by statute was considered in *Brown v. City of Sioux City,* 242 Ia. 1196, 49 N. W. 2d 853; *Van Gilder v. City of Morgantown,* 68 S. E. 2d 746 (W. Va. App. 1949); and *Stocker v. City of Nashville,* 174 Tenn. 483, 126 S. W. 2d 339 (1939).

The State of Georgia in *Mayor & of Savannah v. Lyons*, 54 Ga. App. 661, 189 S. E. 63 (1936), held the operation of a municipal airport to be a governmental institution in the nature of a park under the Uniform Airports Act, but later reversed itself in *Caroway v. City of Atlanta*, 85 Ga. App. 792, 70 S. E. 2d 126 (1952).

One of the earlier decisions concerning this question, frequently cited as well-reasoned, is *Coleman v. City of Oakland*, 110 Cal. App. 715, 295 Pac. 59 (1930). The court there held the City liable for injuries resulting from the negligent operation of a truck in connection with the maintenance and improvement of a municipal airport, saying:

". . . Under the theory of the common law, that the municipality is protected from liability only while exercising the delegated functions of sovereignty, the governmental powers of a city are those pertaining to the making and enforcing of police regulations, to prevent crime, to preserve the public helath, to prevent fires, the caring for the poor and the education of the young; and in the performance of these functions all buildings and instrumentalities connected therewith come under the application of the principle (*City of Kokomo v. Loy*, 185 Ind. 18 [112 N. E. 994]).

"But it is of course true that modern cities and towns enter upon many forms of activity, operate utilities for the benefit of the inhabitants, and provide many means for the easing or improving of the condition of the people that were never dreamed of at common law. Nevertheless the uniform holding as to all such activities, on principle manifestly just to the people themselves, is that no matter how beneficial they may be in a general sense to the inhabitants of the municipality, unless they are governmental in essence, the municipality's conduct in managing them is controlled by the same rules of liability that apply to an individual. . . .

. . . . . . . . . . . . . .

"We have no hesitancy in deciding that in the conduct of an air port the municipality is acting in a proprietary capacity. An air port falls naturally into the same classification as such public utilities as electric light, gas, water, and transportation systems, which are universally classed as proprietary. Its nearest analogy is perhaps found in docks and wharves. . . ." (pp. 719, 720.)

Cases in other jurisdictions holding the operation of an airport by a municipality to be in its proprietary capacity are: *Peavey v. City of Miami*, 146 Fla. 629, 1 So. 2d 614 (1941); *City of Mobile v. Lartigue*, 23 Ala. App. 479, 127 So. 257 (1930); *Brummett v. City of Jackson*, 211 Miss. 116, 51 So. 2d 52 (1951); *Godfrey v. City of Flint*, 284 Mich. 291, 279 N. W. 516 (1938); *Johnson v. City of Corpus Christi*, 243 S. W. 2d 273 (Tex. Civ. App. 1951); *City of Blackwell v. Lee*, 178 Okla. 338, 62 P. 2d 1219 (1936); *Mayor and City Council v. Crown Cork & Seal Co.*, 122 F. 2d 385 (4th Cir. 1941); *Mollencop v. City of Salem*, 139 Ore. 137, 8 P. 2d 783 (1932);

*Department of Treasury v. City of Evansville,* 223 Ind. 435, 60 N. E. 2d 952 (1945); *Patton v. Administrator of Civil Aeronautics,* 112 F. Supp. 817 (D. C. Alaska, 4th Div. 1953); *Heitman v. City of Lake City,* 225 Minn. 117, 30 N. W. 2d 18 (1947); *Behnke v. City of Moberly,* 243 S. W. 2d 549 (Mo. App. 1951); *Rhodes v. Asheville,* 230 N. C. 134, 52 S. E. 2d 371 (1949); *Granite Oil v. Douglas County,* 67 Nev. 388, 219 P. 2d 191 (1950); *Caroway v. City of Atlanta,* supra; and *McLaughlin v. Chattanooga,* 180 Tenn. 638, 177 S. W. 2d 823 (1944).

Many cases have drawn the analogy between an airport and wharves and docks, which have been held to be proprietary. In *Concordia-Arrow Flying Service Corp. v. City of Concordia,* 131 Kan. 247, 289 Pac. 955, this court condoned the subletting of the Concordia Municipal Airport, stating that it was clearly for a "public" (but the court does not state "governmental") purpose, and then classifies the airport with activities held to be proprietary, saying at page 251:

". . . and the airport is to be to air transportation and communication what breakwaters, harbors, docks, wharves and other water frontage facilities are to commerce by the sea. . . ."

The State of Alabama in *City of Mobile v. Lartigue,* supra, in holding the operation of an airport to be a corporate activity of the city and thus proprietary quoted extensively from *City of Wichita v. Clapp,* 125 Kan. 100, 263 Pac. 12, to the effect that "airports" are landing and taking off places for airplanes which traverse air instead of land, and are essentially and primarily an incident to transportation facilities maintained by a city. In the *Clapp* case this court said:

". . . The maintenance of airports, however, comes legitimately within the scope of the municipality in much the same manner as docks and harbor facilities for marine shipping. Airports are said to be as important to commerce as are terminals to railroads or harbors to navigation . . . The possession of the airport by the modern city is essential if it desires opportunities for increased prosperity to be secured through air commerce. . . ." (p. 105.)

The Alabama court in the *Lartigue* case then said:

". . . An airport is a true analogy to a railway station, or a bus terminal. It bears no longer, if it ever bore, any of the essential characteristics of a public playground or recreation park.

.   .   .   .   .   .   .   .   .   .   .   .

"In respect of its purely business relations (as here) as distinguished from those that are governmental, a municipal corporation is held to the same

standard of just dealing that the law prescribes for private individuals or corporations. Then (now) the municipality acts for the private advantage of the inhabitants of the city, and to a certain extent for the city itself." (p. 488.)

This court has often declared the liability of a municipality equal to that of private persons when the City is acting in its "private," "proprietary" or "permissive" character, such as operating waterworks facilities (*McGinley v. City of Cherryvale*, 141 Kan. 155, 40 P. 2d 377), and electric light plant facilities (*Gilmore v. Kansas City*, 157 Kan. 552, 142 P. 2d 699), among others. Concerning the proprietary functions actual pecuniary profit or gain has been discarded as a test by this court. (*Krantz v. City of Hutchinson, et al.*, supra.) Of more significance among the permissive functions of a municipality is whether the activity is commercial in nature. (*Bailey v. City of Topeka*, 97 Kan. 327, 154 Pac. 1014; *Caroway v. City of Atlanta*, supra; and *Mollencop v. City of Salem*, supra.)

In *Stolp v. City of Arkansas City*, supra, this court said:

"It is also included in the general rule covering the dual capacity of cities and towns that when there is an activity or function in a private or proprietary capacity *for the special or immediate* profit, *benefit, or advantage of the city or town*, or the people who compose it, rather than for the public at large, then the city or town is in competition with private enterprise and is accountable for the torts of its employees the same as any other private corporation or individual. . . ." (Emphasis added.) (pp. 202, 203.)

(For opinion on rehearing see *Stolp v. City of Arkansas City*, 181 Kan. 225, 310 P. 2d 888, affirming previous decision.)

If a function undertaken by a municipal corporation is commercial in its nature, the corporation is not exonerated from liability by the fact that its operations are not, or cannot be, profitable. (See, *City of Mobile v. Lartigue*, supra.)

We are convinced and hold that the airport in the instant case is essentially a part of the City's system of transportation facilities. The art of getting from place to place is now exercised by passage through the air as well as along the surface of the earth and on the waters of the earth. An airport is a true analogy to a railway station, a bus terminal and docks and wharves. The airport no longer bears any of the essential characteristics of a public playground or recreation park.

We are of the opinion that the defendant, City of Great Bend, in acquiring and operating the airport in question, displayed a commendable degree of foresight and spirit of progress, but in its operation it is engaged in a purely corporate capacity. The various

commercial transactions of the City of Great Bend in the operation of the airport are only in part indicative of its commercial nature.

An airport is essential to a modern city which desires opportunities for increased prosperity to be secured through air commerce. These *desires* are commercial in nature and the *benefit or advantage* to the City and the citizens of Great Bend is the motivating force. By reason of the manner in which the airport was acquired, consideration also flows to the public at large and the Nation. This does not alter the nature of the operation.

We are not unmindful of the fact that the Government during World War II has constructed many large air bases throughout the State of Kansas, expending vast sums of money in their acquisition, construction, maintenance and operation. In fact, these bases are so large and extended that the operation and maintenance of such bases which have been acquired by adjacent municipalities as local airports are burdensome on the local taxpayers. In this respect the decision before us is not without difficulty. (See *Van Gilder v. City of Morgantown,* supra.)

Having determined that the operation of a municipal airport is a proprietary function of a municipality, we need not be further concerned with legislative enactments that waive immunity from liability for the performance of governmental functions. (See *Anderson Cattle Co. v. Kansas Turnpike Authority,* 180 Kan. 749, 308 P. 2d 172.)

Has the Kansas legislature granted immunity from tort liability to a city in the operation of an airport, which is proprietary in nature?

G. S. 1949, 3-113, states in part as follows:

"That whenever in the opinion of the governing body in any city in the state of Kansas, the *public safety, service and welfare* can be advanced thereby, such governing body of such city *may* acquire within or without the city limits, by purchase, lease, or otherwise, and equip, improve, operate, maintain and regulate a municipal airport or a municipal field for aviation purposes, . . . the expense thereof to be paid out of the general funds of the city or out of funds raised by the tax levy hereinafter authorized. Such airport or field may be used for the service of all aircraft and pilots desiring to use the same, subject, however, to such regulations not in conflict with state laws as may be imposed by ordinance of the city controlling the municipal airport or field. For all purpose of purchase, lease, development and equipping municipal airports and field for aviation purposes, and all things incidental thereto, the governing body of any city may issue bonds after an election as provided by law, . . ." (Emphasis added.)

The defendant claims that the words "public safety, service and welfare" in the above statute are peculiarly applicable to governmental as distinguished from proprietary functions inasmuch as the language speaks of benefit to the public at large, as distinguished from the local inhabitants of the city. To this we cannot agree. The title to the foregoing statute which was enacted by the legislative session of 1943 was "An Act relating to municipal airports and the issuance of bonds therefor, and amending section 3-113 of the Supplemental Statutes, and repealing said original section." (L. 1943, ch. 6, § 1.)

It is obvious that the legislature could not have authorized the acquisition by the City of an airport for "private safety, service and welfare" and have constitutionally authorized the use of general tax funds. The use of the word "public" was intended as a declaration and justification of the powers granted, and in no way a declaration of municipal tort immunity. This construction of the statutory terms is implied in *Concordia-Arrow Flying Service Corp. v. City of Concordia,* supra, in which the public purpose of the statute was attacked and upheld.

This court has held taxation for "private" enterprises to be void. (*National Bank v. City of Iola,* 9 Kan. 689; *City of Geneseo v. Gas Co.,* 55 Kan. 358, 40 Pac. 655; and *C. B. U. P. Rld. Co. v. Smith, Treasurer, &,* 23 Kan. 745.) It is clear that the legislature wisely used the term "public" as a necessary denotation to make subsequent municipal bond issues valid.

The words "governmental" and "public" are not synonymous. Clearly, the authorized acts of all cities are public acts. The fact that the functions or activities of a city are referred to as "public" does not necessarily make them governmental. In the sense that the terms have been used in this opinion, all "proprietary" functions as well as "governmental" functions of a city are "public." In *Leavenworth Co. v. Miller,* 7 Kan. 479, the issuance of bonds by a municipality for the purpose of granting aid to railroads was upheld on the ground that the object was in its nature a public purpose.

In *State, ex rel., v. Kansas City,* 140 Kan. 471, 37 P. 2d 18, the court in validating a bond issue for the improvement of a wharf acknowledged the public character of certain activities which this court has designated as "governmental," and in the same sentence also acknowledged the public character of activities which this court has designated as "proprietary."

Other courts have gone even further in construction of the Uniform Airports Act, or variations thereof. The act in substance declares the operation of an airport by a municipality to be a public, *governmental* and municipal function exercised for a public purpose and matters of public necessity. In *Rhodes v. Asheville,* supra, the North Carolina court held the statute not to exempt municipalities from tort liability in connection with the ownership and operation of airports in spite of the use of the term "governmental" in the statute.

On rehearing in the *Rhodes* case (230 N. C. 759, 53 S. E. 2d 313), the court said the distinction between a governmental and proprietary function of a municipal corporation is a judicial and not a legislative question, and legislative declaration as to the nature of the authority delegated by the statute is not controlling. Similarly, in *Granite Oil v. Douglas County,* supra, the Nevada court held such statute not to be equivalent to a declaration of immunity. (See, *Van Gilder v. City of Morgantown,* supra, *contra*—holding that the legislature can declare what a governmental function is.)

The defendant relies upon *City of Wichita v. Clapp,* supra. In 1927 the City of Wichita acquired land outside of the city limits, 70% of which was to be used for airport and 30% to be used for other park purposes. The airport act at that time did not specifically provide that airports could be acquired outside of city limits. To validate the acquisition of this airport, the court held that the city could properly acquire the airport and maintain it as a part of a municipal park, based upon other statutory authority. This court held in *Harper v. City of Topeka,* 92 Kan. 11, 139 Pac. 1018, that the maintenance of a park was clearly a governmental function. The defendant maintains that by reason thereof the operation of a municipal airport is a "governmental" function.

The *Clapp* case. must be narrowly construed since use of the park statute was imperative to sustain the Park Commissioners' action to acquire land beyond the corporate limits for an airport. The decision itself was not concerned with the issue in the instant case.

The defendant in its over-all attempt to show the legislative intent to grant immunity cites G. S. 1949, 3-114, where the Board of Park Commissioners is given control of municipal airports in cities of the first class over 65,000 in population. This argument, however, is answered by G. S. 1949, 3-126, which places control of municipal airports in the Board of Public Utilities in cities having a population of more than 100,000.

Furthermore, immediately after the *Clapp* case the legislature acted by amending the airport statute to permit the condemnation of land for municipal airport purposes outside the city limits. This was in direct response to the *Clapp* case, and if the statute has not in effect overruled that decision, it has removed the necessity for its application.

Although the talk of an airport as being a part of a park seems absurd today, in 1927 such talk was not too far removed from the times. In 1927 airplanes were in a sense toys for the daring or foolish men. Flying circuses were common, and it was not unusual to take the family out to see some "dern fool" risk his neck in a flying machine. With the passing of time the grown-up boy's toy of yesteryear has become a gigantic industry and air travel has taken its proper place in the field of transportation and commerce. Cases heretofore referred to as the earlier cases were decided in the late twenties and the early thirties in this century.

The defendant relies on G. S. 1949, 3-115, which provides:

"All cities are hereby granted the same *rights, privileges and immunities,* and are charged with the same obligations, responsibilities and duties toward municipal airports and municipal fields for aviation purposes located outside of the limits of any city as now exist for any property now located within the limits of any city, including the right of eminent domain." (Emphasis added.)

The defendant argues the only immunities to which the legislature could have referred were immunity from tort liability for the operation of a governmental function and immunity from taxation. The defendant contends that immunity from taxation is not referred to by the legislature as an "immunity" but as an "exemption," and therefore, concludes that the only immunity intended by the legislature was immunity from liability.

It *is* fundamental that water cannot rise above its source. Therefore, unless the legislature had expressly granted immunity from liability to a municipality in the operation of an airport prior to the enactment of 3-115, *supra*, in 1929 the act itself did not confer immunity. If no immunities existed prior to the act none were created by it.

The State of Kansas has seen fit, in some instances, to permit the waiving of governmental immunity by the purchase of liability insurance. The 1955 session of the legislature in Chapter 248 authorized municipalities to purchase motor vehicle liability insurance, and such statute provides that to the extent that such municipality

has insurance it is considered as having waived its governmental immunity from liability. (G. S. 1955 Supp., 12-2603.)

This legislation is indicative of the fact that the Kansas legislature is capable of speaking with clarity when it desires to do so. The Kansas legislature is free to change the situation at will whenever it chooses to grant immunity to municipalities for the operation of airports. It has not done so.

The ruling of the trial court is affirmed.

PARKER, C. J., PRICE and FATZER, JJ., dissent.