**James L. ANDERSON, Jr., a minor, By and Through James H. DOSS, Uncle and next Friend, Plaintiff-Appellant,**

v.

**JACKSON MUNICIPAL AIRPORT AUTHORITY, Defendant-Appellee.**

No. 78–2457.

United States Court of Appeals, Fifth Circuit.*

Nov. 15, 1982.

See also 5th Cir., 645 F.2d 401.

Roland C. Lewis, Jackson, Miss., for plaintiff-appellant.

Watkins & Eager, Thomas C. Gerity, Jackson, Miss., for defendant-appellee.

Before THORNBERRY, ANDERSON, and THOMAS A. CLARK, Circuit Judges.

PER CURIAM:

In our previous consideration of this case in 645 F.2d 401 (1981), we certified the following questions to the Mississippi Supreme Court pursuant to its Rule 46 permitting such procedure:

(1) Did the omission in the Airport Authorities Law of any provision for immunity in tort continue in effect the rule of law inferred from *Brummett v. City of Jackson,* 211 Miss. 116, 51 So.2d 52 (1951), that an airport authority has no immunity from suit arising out of proprietary or corporate functions? If so, are allegations of supplying equipment for maintenance purposes sufficient to describe such functions?

(2) If the answers to the above questions are in the negative, of what effect on this case was the enactment of the amendment to § 61–3–15(b)? Specifically, does the amended § 61–3–15(b) authorize suits in tort for claims accruing prior to the amendment's enactment, subject only to statutes of limitations that are otherwise applicable?

The Mississippi Supreme Court, 419 So.2d 1010, has answered the first questions in the affirmative in an opinion attached hereto as Exhibit A.

Pursuant to this opinion, the opinion of the Mississippi Supreme Court, and that court's answers to the first question, we reverse the judgment of the district court and remand for further proceedings.

REVERSED and REMANDED.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

EXHIBIT A

IN THE SUPREME COURT OF MISSISSIPPI

NO. 53,194

JAMES L. ANDERSON, JR., A MINOR,
BY AND THROUGH JAMES H. DOSS,
UNCLE AND NEXT FRIEND

V.

JACKSON MUNICIPAL AIRPORT AUTHORITY

En Banc.

BOWLING, Justice, for the Court:

This opinion is issued pursuant to Mississippi Supreme Court Rule 46. For clarification and brevity, we attach hereto as Appendix "A" the entire text of the certification from the Court of Appeals for the Fifth Circuit.**

We begin with the initial premise that the case law from this Court is that the operation of an airport by a municipality is a proprietary or corporate activity and immunity from tort liability is not granted the municipality. *Brummett v. City of Jackson,* 211 Miss. 116, 51 So.2d 52 (1951); and *City of Jackson v. Brummett,* 224 Miss. 501, 80 So.2d 827 (1955). This definite principle has not been overruled by this Court, and we decline to do so here.

As stated by the certification from the Court of Appeals, the Mississippi Legislature during the 1958 session passed two statutes whereby a municipality under either statute could set up, operate and maintain an airport. One separate and distinct statute was styled the "Airport Authorities Law" [1958 Mississippi Laws, Chapter 230, MCA § 61–3–1 *et seq.*] and the other separate and distinct statute passed during the same session was entitled, "Municipal Airport Law." [1958 Mississippi Laws, Chapter 513, MCA § 61–5–1 *et seq.*]

Basically, the Airport Authorities Law authorized a municipality to create a municipal airport authority whereby a corporation would be formed for the construction,

** Editor's Note: The text of the certification appears at 645 F.2d 401, and is not duplicated

operation and maintenance of the airport. The corporation thus formed has officers and the corporation exercises all normal responsibilities in the airport operation, such as hiring and firing of employees, contracting with concessionaires and airlines, and other commercial and related activities operated along with the normal airport activities. For instance, the appellee here, either by contract or otherwise, operates in the airport facility a restaurant, an alcoholic dispensary bar, a motel, insurance selling agency, concession stands, car rental agencies and other such activities—all of which are presumed to bring in profit for the operation of the airport. The City of Jackson is not a defendant in this case. The defendant is the corporate entity set up by the Airport Authorities Law, even though the City of Jackson owns the land on which the airport and its facilities are located and took the necessary action to set up the corporation entity under the said statute.

We are not involved in this case with the "Municipal Airport Law" set out above. The City of Jackson chose not to proceed under that statute.

The only provision that touches on the questions certified by the Court of Appeals in the Airport Authorities Law is set out in MCA § 61–3–83 (1972). The section at the time appellant was injured in August 1976 read as follows:

The acquisition of any land, or interest therein, pursuant to this chapter, the planning, acquisition, establishment, development, construction, improvement, maintenance, equipment, operation, regulation and protection of airports and air navigation facilities, including the acquisition or elimination of airport hazards, and the exercise of any other powers granted in this chapter to authorities and other public agencies, to be severally or jointly exercised, are hereby declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity. All land and other

herein.

property and privileges acquired and used by or on behalf of any authority or other public agency in the manner and for the purposes enumerated in this chapter shall and are hereby declared to be acquired and used for public and governmental purposes and as a matter of public necessity.

Appellee contended in the district court and contends before this Court, although no cross appeal was taken from the district court's decision on this point as hereinafter related, that the above quoted section was a legislative mandate that the operation of the airport by Jackson Municipal Airport Authority was not a proprietary or corporate activity. Nowhere else in the Airport Authorities Law is there any pronouncement, either direct or indirect, that would bear on the prevailing case law in effect by the prior cited opinions of this Court.

The district court, in a rather lengthy opinion, specifically held that MCA § 61–3–83 was not a directive that the proprietary character of the airport was changed to "governmental function" as that term is considered in connection with governmental immunity of municipalities.

We stop here and refer to the other statute [Municipal Airport Law passed by the legislature at the same session it passed the Airport Authorities Law]. The provisions of that statute are quite different. We refer to it only for the reason that it was referred to by the Federal District Court and the Court of Appeals. The provisions of the Municipal Airport Law have no bearing on this case whatever except in considering the legislative intent when the two acts were passed simultaneously. In the Municipal Airport Act, as set out in MCA § 61–5–47, it repeated the language of MCA § 61–3–83 of the Airport Authorities Law, but saw fit to add a paragraph by stating as follows:

No action or suit sounding in tort shall be brought or maintained against the state or any municipality thereof, or the officers, agents, servants, or employees of the state or any municipality thereof, on account of any act done in or about the construction, maintenance, enlargement, operation, superintendence or management of any airport or other air navigation facility.

Although not material to the legal issues involved, the Airport Authorities Act provided that the authority may sue or be sued. The Municipal Airport Act has no such provision. This is material only in considering legislative intent when the two acts were adopted.

The federal district court in discussing MCA § 61–3–83 [Airport Authorities Law] stated:

If the Mississippi Legislature had deemed the language of MCA § 61–3–83, when viewed alone, as sufficient to confer tort immunity upon airport authorities, then why did the legislature supply an express grant of immunity in the second paragraph of MCA § 61–5–47?
. . . .

In the Court's opinion MCA § 61–3–83 is not a grant of immunity, but its true construction is not hard to find. In *Rhodes v. City of Asheville,* [230 N.C. 134] 52 S.E.2d 371 (N.C.1949), *petition for rehearing denied* [230 N.C. 759] 53 S.E.2d 313, the case cited by the Court in *Imperial Production Corp.,* [*v. City of Sweetwater,* 210 F.2d 917 (5th Cir.)] *supra,* the statute declared the operation of a municipal airport "to be public, governmental and municipal functions exercised for a public purpose and matters of public necessity." In interpreting this phrase the court said a municipal corporation cannot legally engage in any enterprise in its governmental or proprietary capacity which does not come within the meaning or definition of a public purpose, and that the interpretation placed by the court on the language of the statute quoted above was the legislature intended to declare the operation of an airport a governmental function in the sense that it was a public purpose, and thus an appropriate activity for a municipality.

As stated at the outset, this Court many years ago held positively that the operation of an airport by a municipality is a proprie-

tary or corporate activity. The vast majority of authority is the same. The Supreme Court of North Carolina, in *Rhodes, supra,* had before it a statute almost identical to MCA § 61–3–83. The North Carolina Supreme Court prior to discussing that statute and its implication on the immunity question stated:

> The overwhelming weight of authority is to the effect that the construction, operation, and maintenance of an airport by a municipality is a proprietary function and that such municipality may be held liable in tort for the negligent operation thereof.

and, further:

> We have found no decision and the appellants have cited none in which any court of last resort in this country has held that the construction, operation, and maintenance of an airport by a municipality is a governmental function and that municipalities may not be held liable in tort for the negligent operation thereof, except where they have been expressly exempted from such liability by statute.

The North Carolina Supreme Court then in discussing that state's statute, almost identical to MCA § 61–3–83, said the following:

> The interpretation we place on the language of the statute upon which the defendants are relying for immunity, leads to the view that it was the intent of the Legislature to declare that the acquisition, construction, operation and maintenance of an airport by a municipality was a governmental function in the sense that it was a public purpose. Note the language of the statute: "The acquisition, establishment, construction, enlargement, improvement, maintenance * * * and the exercise of any other powers herein granted to municipalities, are hereby declared to be public, governmental and municipal functions exercised for a public purpose and matters of public necessity."

In light of our own decision and the other authorities cited herein, we are of the opinion that our General Assembly did not exempt municipalities from tort liability in connection with the ownership and operation of airports by the enactment of G.S. § 63–50, and we so hold.

The reasoning of the North Carolina Supreme Court and the federal district court in the case before us is clear. MCA § 61–3–83, as was said by the Supreme Court of North Carolina, was merely a declaration that the procedure under which the corporate municipal airport authority was set up and operated was done as a "governmental function" and for the express purpose of providing a facility for public use because of "public necessity." As has been said, we presume that the legislature knew what it was doing in passing on the various sections of the two statutes we have discussed. It would have been a simple matter to have added the paragraph to MCA § 61–3–83 that it did in the Municipal Airport Law in MCA § 61–5–47. One reason that stands out in addition to the other reasons would be that in the Municipal Airport Law the municipality would be the defendant in tort actions and in the Airport Authorities Law, the corporation set up through the office of the Secretary of State would be the sole defendant, although controlled in principal by the municipality.

The last paragraph of MCA § 61–5–47 was enacted by the legislature the same day the Airport Authorities Act, § 61–3–83 was enacted. Since this is so, we conclude the legislature thought the immunity paragraph was necessary to express their intention of immunity. To hold otherwise, with deference as the appellee contends, is only to say that the legislature did a vain, foolish or repetitious act by the immunity paragraph that concludes § 61–5–47 as hereinbefore quoted. The words of the paragraph appear to have been deliberately chosen and have some purpose. It is not the inadvertent omission of a word by the scrivener and neither do we think the legislature intended its language to be considered unnecessary as appellee contends.

In our judgment the legislature intended the immunity language to have some purpose and if that intention or purpose does not lead to an unreasonable result we

should honor the words by giving them a fair construction. The *Brummett* cases *supra,* were announced by this Court some three or four years prior to the legislative enactments and at least in theory the legislature was aware of this Court's holding which stated that "the airport of the city was acting in a corporate and not a governmental capacity." Had the legislature intended uniformity in the statutes as appellee suggests, this could have been easily accomplished by adding the immunity statute to MCA § 61–3–83 or deleting it from MCA § 61–5–47 gaining uniformity as well as liability. Either hypothesis would have been an easy and reasonable thing for the legislature to do had they desired uniformity. But they did neither. Instead they included the immunity statute in one act and omitted it from the other, leading us to the conclusion that they did not intend uniformity but rather intended the Airport Authorities Act, MCA § 61–3–83, to come within the *Brummett* decisions and the Municipal Airport Act, MCA § 61–5–47, be withdrawn from liability set forth in *Brummett.* To accomplish this the legislature granted specific immunity in MCA § 61–5–47.

In *Entrican v. King,* 289 So.2d 913 (Miss. 1974), we held:

> Language used in a statute will be given its ordinary and usual meaning, if possible, and there must be accorded to the Legislature a reasonable purpose in making amendments. Moreover, it must be considered that amendments are intentionally made, and that in making them, the legislature had some rational purpose in view. The personal liability imposed for violation of section 9118–10 is restricted, in plain language contained in the section itself to violations of that section.

The language contained in earlier statutes imposing liability for violation of the "Act" or "Chapter" was deleted. This Court may not amend a statute by inserting provisions for personal liability where the legislature clearly has not done so.

It would seem to follow that if the court cannot write liability into a statute by inserting provisions for personal liability that surely it could not strike a paragraph as meaningless to establish immunity uniformly. We think it is axiomatic that courts will not construe a legislative act to be without effect if some reasonable purpose may be fairly attributed to it.

The problem in the case seems to be attached to the words "declared to be public and governmental" in MCA § 61–3–83. This Court is presently committed to the judicially imposed doctrine of sovereign immunity, but as to municipal corporations, there is a qualification, viz, whether the function resulting in damages to a plaintiff is "governmental" or "proprietary."

These two words are chosen by the court, not because the words themselves have a special inherent meaning; rather those terms are chosen by the courts to designate or categorize in general the activities for which a municipal corporation may be civilly liable, and those for which it will not be civilly responsible. Sometimes other words are used, but we will stay with these.

The classifications are broad, very general, and the line between the two is quite frequently difficult to define. Nevertheless, there are certain activities which courts choose to call "governmental" for which no liability is imposed for wrongful or tortious conduct. These are activities or services which a municipality is required by state law to engage in and to perform.[1]

---

1. The following are "governmental" functions: the decision whether to place traffic control devices at an intersection, *Nathaniel v. City of Moss Point,* 385 So.2d 599 (Miss.1980); establishment and regulation of schools, hospitals, poorhouses, fire departments, police departments, jails, workhouses, and police stations, *Jones v. City of Amory,* 184 Miss. 161, 185 So. 237 (1939); *Bradley v. City of Jackson,* 153 Miss. 136, 119 So. 811 (1928); *See, Jackson v.*

*Smith,* 309 So.2d 520 (Miss.1975); (police department) *City of Leland v. Leach,* 227 Miss. 558, 86 So.2d 363 (1956); (Hospital) *City of Hattiesburg v. Geigor,* 118 Miss. 676, 79 So. 846 (1918); (fire department), the adoption and enforcement of ordinances and regulations for the prevention of the destruction of property by fire or flood, and the manner and the character of the construction of buildings; *Bradley v.*

On the other hand, there are activities in which a municipal corporation engages, not required or imposed upon it by law, about which it is free to perform or not. Such activities the courts call "proprietary or corporate". This Court has judicially construed other permissible "public and governmental" activities to be "corporate or proprietary." [2]

From what has been stated, it is readily apparent that in using the words "governmental" or "proprietary" to determine immunity from or liability to suit, the courts are using the words in a special, limited sense. Of course, all municipal "proprietary" functions are also "public" and "governmental" in the common use or understanding of those words. These proprietary functions are for the public good, and, indeed, sometimes of public necessity. They are part of the city's government and the city may levy taxes to support them. They are not private in the ordinary sense of the word. Thus, a function of a municipality may be of public necessity and convenience, of public good, and "governmental" in every sense of the word, but it is still not within the special meaning of "governmental" as used in court decisions.

It is also readily apparent that the determination of whether a certain activity of a municipal corporation is governmental or proprietary for purposes of judicial application is a fact to be determined in each particular case from an examination of the activity involved.

There can be no doubt that the legislature could by law change what would ordinarily be proprietary into a governmental function. It could make this change by imposing a legal duty upon the municipality as part of its function to perform this activity. Just as clearly, the legislature has the power, circumscribed only by Constitutional restraints, to declare limited or absolute immunity as to any activity, regardless of whether it is private, proprietary, or whatever.

We do not believe, however, the legislature has ever attempted to change a completely proprietary function for which a municipal corporation is civilly liable into a completely governmental function, rendering it immune from civil liability, simply by some arbitrary or random use of words. Nor has the legislature ever attempted to effect a metamorphosis of a function from governmental to proprietary simply by use of general words.

*City of Jackson, supra; See Jones v. City of Amory, supra,* (repair of city hall).

2. The operation of a city garbage dump. *City of West Point v. Meadows,* 236 Miss. 394, 110 So.2d 372 (1959); the construction and maintenance of sewage outlets to and from building, *Semple v. City of Vicksburg,* 62 Miss. 63, (1884); the maintenance and repairing of streets, *Warren v. Town of Booneville,* 151 Miss. 457, 118 So. 290 (1928); the construction and maintenance of sidewalks, *Bishop v. City of Meridian,* 223 Miss. 703, 79 So.2d 221 (1955); the operation and management of an electrical power plant by a municipality, *Yazoo City v. Birchett,* 89 Miss. 700, 42 So. 569 (1906); the construction of a nuisance, such as a hog pond, close to plaintiff's residence, *Crawford v. Town of D'Lo,* 119 Miss. 28, 80 So. 377 (1918); the operation by the city of a fair, baseball park, or football stadium, *City of Jackson v. McFadden,* 181 Miss. 1, 177 So. 755 (1937); the operation of a fire hydrant, *City of Columbus v. McIlwain,* 205 Miss. 473, 38 So.2d 921 (1949); the hauling of trash and dirt by the city, *City of Pass Christian v. Fernandez,* 100 Miss. 76, 56 So. 329 (1911); the operation and maintenance of a zoo, *Byrnes v. City of Jackson,* 140 Miss. 656, 105 So. 861 (1925); the creation of a dangerous situation regarding trees near sidewalks, streets or neutral areas, *City of Hattiesburg v. Hillman,* 222 Miss. 443, 76 So.2d 368 (1954); the operation of river landings for ingress and egress by boats, *City of Vicksburg v. Scott,* 168 Miss. 572, 151 So. 914 (1934); the construction and maintenance of a bridge over a gully or ditch near a sidewalk or street, *Hardin v. City of Corinth,* 105 Miss. 99, 62 So. 6 (1913); the construction and maintenance of a drain to provide for controlling rainfall, *City of Vicksburg v. Porterfield,* 164 Miss. 581, 145 So. 355 (1933); the offensive odors from a negligently operated sewage system, *Forbes v. City of Durant,* 209 Miss. 246, 46 So.2d 551 (1950); the supervision of the construction of a wall of a building not owned by the city, *Ditta v. City of Clinton,* 391 So.2d 627 (Miss.1980); the overhead traffic control signal lights and stop signs at intersections, *Tucker v. City of Okolona,* 227 So.2d 475 (Miss.1969), and *Wall v. City of Gulfport,* 252 So.2d 891 (Miss.1971).

Therefore, even though a statute may refer to some purely proprietary function as in the public good, as a public necessity, or as governmental in character, our view is the legislature is using the words in their broader context, as a justification of use of public funds in their operation, and not the special meaning in which they are used in court cases as tests to determine immunity.

Indeed, let us assume that the legislature is considering a statute which will authorize municipalities to engage in some public function, and wishes to grant immunity to any city from suit for such activity. Would not the legislature in such case simply provide specifically that the city shall be immune from suit, so as to remove the matter from question, rather than inserting the random word "governmental" somewhere in a series of words authorizing or describing the function? Why invite speculation when the matter can be made certain?

Since sovereign immunity is something which has been created entirely by our courts (not the legislature or the Constitution), and further, the determination of whether a municipal function is "proprietary" or "governmental" has likewise been the sole responsibility of the judiciary, then in our view, at least, the absence of a specific statement from the legislature granting immunity in the statute indicates the legislative intent to leave to the Court the determination whether such municipal function is "proprietary" or "governmental."

If the legislature chooses to grant immunity to a city for a purely proprietary activity, it can do so by stating in the act which authorizes the activity that the city shall not be subject to suit for any such activity.

Because the legislature, with our holding in *Brummett* fresh on its mind, saw fit to flatly state in the Municipal Airport Act that the city was immune from suit, but omitted this provision from the Airport Authorities Act, how can there be any other conclusion but that the legislature intended *Brummett* to remain in effect as to airports created under the Airport Authorities Act, but to abrogate *Brummett* insofar as it

concerns an airport created and operated under the Municipal Airport Act.

The United States District Judge had no difficulty reaching this conclusion.

Indeed, there have been decisions from sister jurisdictions in which their highest Courts, faced *solely* with the language of the Airport Authorities Act, and not having the good fortune to be fortified with a comparison of two statutes as we have here, nevertheless held the operation of airports to be proprietary and not governmental.

We heretofore have discussed the North Carolina case of *Rhodes, supra.* Nevada also has a municipal or county airport act with language almost identical to ours and North Carolina's. In *Granite Oil Securities, Inc. v. Douglas County,* 67 Nev. 388, 219 P.2d 191, 16 A.L.R.2d 1069 (1950), the Nevada Supreme Court considered its airport act, entitled "Municipal Airports Act," providing that the acquisition of land and exercise of the powers thereunder, ". . . are hereby declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity; and . . . are declared to be . . . public and governmental." The act further provided that all land and other property and privileges acquired by and on behalf of any municipality or other public agency in the manner and for the purposes enumerated in the act ". . . shall and are hereby declared to be acquired and used for public and governmental purposes as a matter of public necessity, and, in the case of a county or municipality, for county or municipal purposes, respectively."

Again, it was there argued that the words in the act constituted a declaration of sovereign immunity. The Nevada Supreme Court rejected this argument, primarily relying on the decision of the North Carolina Supreme Court in *Rhodes, supra.*

Both cases referred to the experience in Tennessee, in which the operation of an airport was not only declared to be governmental by statute, but municipalities engaged therein were statutorily specifically granted immunity from suit. The inference

in both the *Rhodes* and *Granite Oil Securities* cases was that if the legislature intended the function to have immunity it would have specifically granted it in the act, and not simply by use of the word "governmental." *See Stocker v. City of Nashville,* 174 Tenn. 483, 126 S.W.2d 339, 124 A.L.R. 345 (1939).

The above holdings are reiterated in *Caroway v. City of Atlanta,* 85 Ga.App. 792, 70 S.E.2d 126 (1952), and *Brasier v. Cribbett,* 166 Neb. 145, 88 N.W.2d 235 (1958). Both cases involved interpretations of statutes with wording almost the same as our Mississippi acts, and whether use of the word "governmental" precluded suit for negligence against a municipality. Both cases held that the operation by the city of an airport was proprietary in nature, and that the wording of the statute did not make the function governmental in the sense in which this word is used in these special court cases. Both cases held the municipality subject to suit.

Thus, we have four well-reasoned opinions from sister jurisdictions which have examined almost identical statutory language as is found in both our 1958 acts. Those courts found no legislative intent to grant immunity thereby. It is also pertinent that in none of these cases was there another act to compare with the Municipal Airport Act, as we have in Mississippi, with one specifically granting immunity and the other silent on the subject.

In 1958, the Mississippi Legislature had these model airport acts before it, and the interpretations thereon by at least three of the highest courts in other jurisdictions. Recognizing the meaning given the word "governmental" in other jurisdictions, our legislature saw the need, as had the Tennessee legislature previously, of adding a provision specifically granting immunity. The Municipal Airport Acts of North Carolina, Nevada, Georgia and Nebraska do not contain any specific grant of immunity.

Clearly, our legislature specifically granted sovereign immunity from the operation of any airport under the Municipal Airport Act because the act specifically so stated.

The omission of this prohibition against suit from the Airport Authorities Act, enacted on the same date in the same legislative session, is pregnant with meaning.

What does this omission mean? What can it mean, other than that the legislature intended that insofar as airports operated under the Airport Authorities Act were concerned, they would operate as proprietary functions under our ruling in *Brummett.*

There can be no doubt that if North Carolina, Georgia, Nevada or Nebraska were called upon to interpret our Municipal Airport Act, absent the paragraph specifically and flatly prohibiting suits, all would hold that no immunity is granted simply by use of the word "governmental." Even if we were only confronted with the same question as presented to those jurisdictions, our holding should be the same as theirs.

Our Court is doubly aided in being provided with two acts for comparison, one which specifically grants immunity, and the other which does not. We cannot in logic or reason hold otherwise than there was no legislative intent to grant immunity from suit under the Airport Authorities Act.

Appellee advances two cases to support its arguments. The only state court decision is *Kirksey v. City of Fort Smith,* 227 Ark. 630, 300 S.W.2d 257 (1957), 66 A.L.R.2d 627 (1959). Overlooked, however, is that the common law of Arkansas, as opposed to that of Mississippi, provides that light plants, waterworks, and swimming pools are all considered governmental functions and not proprietary. In Mississippi, as in most jurisdictions, at least some, if not all, of these municipal functions would be considered proprietary by our Court.

After stating why the Arkansas Supreme Court distinguished its holding from *Rhodes, supra,* the Court stated:

There is a notable lack of harmony among the various jurisdictions in the application of the governmental-proprietary distinction to specific municipal activities and functions. One legal scholar has observed that the divergent rules

adopted by American courts "make a curious patchwork of immunity and responsibility." Plaintiff correctly states that the weight of authority supports the proposition that the operation of a municipal airport is a proprietary function. However, as the trial court indicated, the same jurisdictions which so hold have also found the operation of waterworks, light plants and swimming pools by a municipality to be a proprietary function, *while our cases are to the contrary.* (Emphasis added).

In Arkansas, the following municipal functions have been considered "governmental": maintenance of city streets, *Risser v. City of Little Rock,* 225 Ark. 318, 281 S.W.2d 949, *Patterson v. City of Little Rock,* 202 Ark. 189, 149 S.W.2d 562 (1941); operation of electrical system, *City of Little Rock v. Holland,* 184 Ark. 381, 42 S.W.2d 383 (1931).

In fact, the Arkansas Supreme Court was moved to state ten years later in *Parish v. Pitts,* 244 Ark. 1239, 429 S.W.2d 45 (1968):

No case of liability for personal injury by a municipality is found in the Arkansas reports. In Arkansas, the immunity of the municipality in the tort field is, in practice, complete at present.

In *Parish,* the Arkansas Supreme Court abolished the doctrine of sovereign immunity as applied to municipalities.

Neither is *Imperial Production Corp. v. City of Sweetwater,* 210 F.2d 917 (5th Cir. 1954), any support for appellee's position, but rather to the contrary, as a careful reading will reveal.

There the Court of Appeals had an entirely different legislative and judicial history on the question before it than we now have.

In 1929, the Texas legislature enacted 1929 Texas Gen.Laws, ch. 83 [codified at Texas Civ.Stat.Ann., art. 1269h (Vernon 1063)] authorizing cities and counties to acquire and operate airports. Section 3 of the act contained the following provision:

... and no city or county shall be liable for injuries to persons resulting from or caused by ... any negligence, want of skill, or lack of care on the part of any governing Board of Commissioners' Court, officer, agent, servant or employee or other person with reference to the ... management, conduct, or maintenance of any such Air Port ... or thing of any character whatever, located therein or connected therewith.

This act also authorized municipalities to acquire land for airports, to condemn land for that purpose, to maintain and operate airports, to issue bonds and levy taxes to that end, and to do all things necessary for this purpose.

In 1933, there was an exhibition at the El Paso airport at which the plaintiff was injured. The plaintiff sued. Upon appeal, the city argued it had immunity by statute. The Texas Court of Appeals in *Christopher v. City of El Paso,* 98 S.W.2d 394 (Tex.Civ. App.1936), held the operation of an airport to be a proprietary function, and not a governmental function. It then held the above quoted portion of the statute, which granted immunity for this proprietary function of the city, violated the due process clauses contained in both the United States and Texas Constitutions. The Texas Court specifically determined, however, that the remainder of Article 1269h would be unaffected by its decision.

There was no repeal of any of this section by the Texas legislature, including the portion granting immunity, following the decision in *Christopher.* In fact, in 1941 and again in 1947, the Texas legislature amended Article 1269h bringing forward all powers of cities in the acquisition, operation, condemnation, issuance of bonds and levying of taxes for municipal airports, as well as specifically granting immunity from suit.

Also in 1947, the Texas legislature adopted its Municipal Airport Act, Section 15 of which declared the operation of an airport by the municipality "to be public and governmental functions, exercised for a public purpose, and matters of public necessity," the same as Section 15 of the Mississippi Municipal Act. *See* 1947 Tex.Gen.Laws § 1–22 [codified at Tex.Civ.Stat.Ann. arts. 46d–1—46d–22 (Vernon 1969)].

Thereafter, suit was brought in the United States District Court for the Northern District of Texas by Imperial Production Corporation against the City of Sweetwater for the destruction of one of Imperial's planes, which it alleged resulted from the negligence of an airport employee. The plane was destroyed by fire in March, 1951. The suit was dismissed by the district court judge on the ground that the city was immune under the statute.

Just as it had been argued in *Rhodes, supra,* the plaintiff corporation argued upon appeal that in Section 15 of the Texas Municipal Airport Act the use of the word "governmental" meant that only taxation, condemnation, appropriation, and such were concerned. The North Carolina case was urged as authority for this argument.

The Court of Appeals agreed this would be the case if the legislative and judicial history of Texas were similar to that of North Carolina when the respective acts were passed. 210 F.2d at 919.

The Court of Appeals went on to point out, however, that in 1936, the Texas Court of Civil Appeals in the *Christopher* case had held Section 3 (granting immunity) unconstitutional predicated on the holding that operation of an airport was *proprietary,* and also held that the remainder of the act would be unaffected by this decision. The Court of Appeals further pointed out that following this *Christopher* decision, municipalities continued to have the power to condemn land, issue bonds, and levy taxes for airport purposes.

Therefore, the Court of Appeals reasoned that Section 15 of the Texas Municipal Airport Act granting municipalities the same powers as they had enjoyed under Article 1269h could have only had one purpose in its use of the word "governmental", and that was to change the function of an airport from proprietary to governmental. Otherwise, there was no purpose whatever in Section 15 being enacted.

Quoting from the opinion:

The appellants elaborate their second point by urging that the effect of the statute [section 15] is to declare the City's operation of an airport to be governmental only insofar as material for taxation, condemnation, appropriation, bonded indebtedness, the authority of public officers, etc., but not in such sense as to free the City from tort liability. The North Carolina case of *Rhodes v. City of Asheville* cited by appellants furnishes strong support for their position and, we think, *should be followed if the legislative and judicial history of Texas were similar to that of North Carolina at the time the respective acts were passed.* Appellee points out, however, that the appellants' position becomes untenable in the light of the existing law in Texas when Article 46d–15 was enacted.

The original airport legislation in Texas was enacted in 1929 and amended in 1941 and 1947. In 1936 a Texas Court of Civil Appeals in *Christopher v. City of El Paso,* 98 S.W.2d 394, held Section 3 of the Act to be violative of the Equal Protection Clause of the Fourteenth Amendment and the Due Process Clause of the Texas State Constitution, Vernon's Ann.St. art. 1, § 19. That holding, however, was predicated upon the operation of the airport being a proprietary function, and the Court said: " * * * *we cannot agree that the legislature in granting the power to incorporated cities in Texas to own and operate airports made the exercise of such power a governmental function."* *Christopher v. City of El Paso,* supra, 98 S.W.2d at page 398. The Texas Court expressly determined that the remainder of the Act was unaffected by its decision. After that decision, therefore, Article 1269h of the Revised Civil Statutes, Vernon's Ann.Civ.St. (Footnote 4, supra) still furnished authority to municipalities to acquire land for airports, to condemn land for that purpose, to maintain and operate airports, to issue bonds and levy taxes to that end, and to do all things necessary to the accomplishment of the statutory purpose.

The act with which we are now concerned, Article 46d–15 (footnote 1, supra) was adopted in 1947, the same year in

which Article 1269h was last amended. There was no need for Article 46d–15 to accomplish the purposes for which appellants contend that it was intended. *Those purposes were already accomplished by Article 1269h.* It is, of course, elementary that a statute should be so construed as to give it a field of operation and to make it an effective law. The legislature is never presumed to have done a vain thing in the enactment of a statute. See 50 Am.Jur., Statutes, Sections 357, 362. In the light of the then existing law, we can see no effective meaning to be given to Article 46d–15, other than that the designation of the functions therein as being public and governmental carried with it all of the consequences which such a designation entails, including exemption of the municipality from tort liability. (Emphasis added). (Footnotes omitted)

Faced with a state act unequivocally and specifically doing so, it presents no difficulty for a Texas court to fathom in the background a legislative intent to grant sovereign immunity. In our view, there can be little doubt that had the Court of Appeals for the Fifth Circuit in *Sweetwater* simply been faced with an interpretation of Section 15 of the Texas Municipal Airport Act, absent the special legislative and judicial history of that state, it would have followed the rationale of *Rhodes, supra,* and held that the operation of an airport by a municipality is a proprietary function.

Even such minimal doubt is removed, however, when the Mississippi legislative and judicial history is considered.

1. Legislative Act of 1928, but granting no municipal powers to condemn, issue bonds, or levy taxes as was the case in Texas;

2. *Brummett* decisions; and

3. Two acts passed simultaneously in Mississippi in 1958:

A. Municipal Airport Act—specifically granting immunity

B. Airport Authorities Act—silent as to immunity.

Even if we accepted the contention of appellee that the legislature in the use of the word "governmental" might be using the word in the strict and limited sense in which it is used in these court decisions, and giving it a reason for rejecting the holding in *Rhodes, supra,* it is interesting to note that the Nevada Supreme Court in *Granite Oil Securities v. Douglas County, supra,* said it did not need to address the question of whether such a determination was solely within the province of the judiciary rather than the legislature. The reason for this is clear—it was plain to the Nevada Supreme Court that the word "governmental" in the Nevada statute was not intended by the legislature to do more than support the validity of the act.

Thus, we are left with a naked statement that when the word "governmental" was used in the Airport Authorities Act, the legislature intended to use it in the special, limited sense courts use the term in only those special cases determining "proprietary" functions as an exception to sovereign immunity.

We are not faced with the novel question of whether the legislature *could,* if it chose, legally change a *proprietary* function of the city into a *governmental* function, as courts define these words, simply by stating: "Hereafter all such functions will be *governmental* in character rather than *proprietary,* as these words are interpreted by court decisions." Rather, the question we have is whether the legislature attempted or intended to do so, as to an airport under the Airport Authorities Act. Our view is that the legislature obviously had no such intention.

In conclusion, we now answer the first two questions certified to us by the Court of Appeals. Those answered render question number three moot.

Question No. 1: Did the omission in the Airport Authorities Law of any provision for immunity in tort continue in effect the rule of law inferred from *Brummett, supra* that an Airport Authority has no

immunity from suit arising out of proprietary or corporate functions?

The answer to this question is "YES." Question No. 2: If so, are allegations of supplying equipment for maintenance purposes sufficient to describe such functions?

. . . . .

The answer to this question is also "Yes."

It is therefore ordered that the above and foregoing opinion of this Court be certified by the Clerk of this Court to the Clerk of the Court of Appeals for the Fifth Circuit as this Court's answer to the certification request under Rule 46.

PATTERSON, C.J., and ROY NOBLE LEE, HAWKINS, and DAN M. LEE, JJ., concur.

SUGG and WALKER, P.JJ., and BROOM and PRATHER, JJ., dissent.

[The text of the Fifth Circuit's certification, attached to the opinion of the Mississippi Supreme Court as "Appendix A," appears at 645 F.2d 401 and is omitted here.]

SUGG, Presiding Justice, concurring in part and dissenting in part:

I dissent from the answer of the majority to the first question certified by the United States Court of Appeals for the Fifth Circuit for the reasons hereinafter stated.

I

The question involves public policy of the State of Mississippi. The question of whether a municipal function is governmental or proprietary is determined in accordance with the public policy in the jurisdiction in which it arises. *Kirksey v. City of Fort Smith,* 227 Ark. 630, 300 S.W.2d 257 (1957), 66 A.L.R.2d 627, 63 C.J.S. *Municipal Corporations,* § 747. In *State ex rel. Knox v. Hines Lbr. Co.,* 150 Miss. 1, 115 So. 598 (1928), quoted with approval in *Cappaert v. Junker,* 413 So.2d 378 at 380, we stated:

[T]his court is committed to the doctrine that the public policy of the state

must be found in its constitution and statutes, "and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials." (150 Miss. at 48, 115 So. at 605).

The doctrine stated in *Knox* was based on *U.S. v. Trans-Missouri Freight Assn.,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1896), in which the United States Supreme Court held:

The public policy of the government is to be found in its statutes, and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials; but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts. (166 U.S. at 340, 17 S.Ct. at 559, 41 L.Ed. at 1027).

We are firmly committed to the principle that public policy decisions are not made by the court unless the Constitution and statutes have not directly spoken on the question involved. In numerous cases we have held that the legislature declares the public policy of the state and the Supreme Court's function is limited to deciding whether the legislature had the power to act in passing a law but not whether it ought to have acted in the manner it did. See cases annotated in Mississippi Digest, *Constitutional Law,* Key No. 70(3) and 70.3(3) and (14). 16 Am.Jur.2d *Constitutional Law,* § 245.

In *Brummett v. City of Jackson,* 211 Miss. 116, 51 So.2d 52 (1951)[1] we held that the operation of an airport by a municipality was a corporate and not a governmental function. When *Brummett* was decided the only authority for a municipality to operate an airport was contained in Chapter 63, Mississippi General Laws (1928) (Section 7538 Code of 1942). The statute merely authorized a municipality to acquire and operate airports and did not declare that the operation of an airport was a governmental function.

---

1. On the second appeal of *Brummett,* a judgment against the City of Jackson was affirmed.

*City of Jackson v. Brummett,* 224 Miss. 501, 80 So.2d 827 (1955).

In 1958 the legislature enacted the Airport Authorities Law, Chapter 230, General Laws of Mississippi (1958). Included in Chapter 230 was Section 15 which now appears as section 61–3–83 Mississippi Code Annotated (1972). The statute follows:

The acquisition of any land, or interest therein, pursuant to this chapter, the planning, acquisition, establishment, development, construction, improvement, maintenance, equipment, operation, regulation and protection of airports and air navigation facilities, including the acquisition or elimination of airport hazards, and the exercise of any other powers granted in this chapter to authorities and other public agencies, to be severally or jointly exercised, are hereby declared to be *public and governmental functions, exercised for a public purpose, and matters of public necessity. All land and other property and privileges acquired and used by or on behalf of any authority or other public agency in the manner and for the purposes enumerated in this chapter shall and are hereby declared to be acquired and used for public and governmental purposes and as a matter of public necessity.*

When *Brummett* was decided by this Court the public policy question of whether the operation of an airport by a municipality was a governmental or a proprietary function had not been addressed by the legislature, so this Court filled the void and held the operation of an airport by municipality was a corporate and not a governmental function. However, the legislature spoke on this public policy question in 1958 in unequivocal terms and provided that the operation of an airport by an airport authority is a governmental function.

As demonstrated by the authorities heretofore cited, the legislature has the authority to declare the public policy with reference to the operation of airports. Matters of public policy are for the legislature to declare and it is not the function of the courts to question the wisdom of a declaration of public policy by the legislature. *Durham v. Durham*, 227 Miss. 76, 85 So.2d

807 (1956). When the legislature declares public policy of the state, its declaration is final as far as the courts are concerned. *Golding v. Armstrong*, 231 Miss. 889, 97 So.2d 379 (1957).

The majority follows the North Carolina Court in its interpretation of a similar statute as reported in *Rhodes v. City of Asheville*, 230 N.C. 134, 52 S.E.2d 371 (1949). The North Carolina court held that the determination of whether the operation of a municipal airport was a proprietary or a governmental function was a *judicial* and not a legislative question. This holding of the North Carolina Court is at variance with our cases which specifically hold that the legislature may determine the public policy and if the statute declaring public policy is not unconstitutional, the courts are bound by the legislative declaration. Other states which have followed the North Carolina case are likewise at variance with our cases.

In my opinion *Imperial Production Corp. v. City of Sweetwater*, 210 F.2d 917 (5th Cir. 1954) is a case in which the legislative and judicial history closely parallels the Mississippi legislative and judicial history authorizing municipalities to operate airports either directly or by an airport authority.

Mississippi passed a statute authorizing municipalities to acquire airports in 1928.

Texas passed a statute authorizing municipalities to acquire airports in 1929.

Mississippi held the operation of an airport by a municipality to be a corporate function in 1951. *Brummett, supra.*

Texas held that the operation of an airport by a municipality was a proprietary function. *Christopher v. City of El Paso*, 98 S.W.2d 394 (1936).

Mississippi passed the Airport Authorities Law in 1958 and provided that the acquisition, development, maintenance and operation of an airport by such authority was a public and governmental function and all property acquired and used by and on behalf of any authority "Shall and are hereby declared to be acquired and used for public

and governmental purposes and as a matter of public necessity."

Texas amended its airport law in 1957 by Article 46d–15 and provided that the acquisition, development, construction and operation of an airport by a municipality, "Are hereby declared to be public and governmental functions, exercised for a public purpose and matters of public necessity . . ." After setting forth the legislative and judicial history of Texas with reference to the operation of airports by municipalities, the Fifth Circuit then distinguished the Texas legislative and judicial history from that of North Carolina and stated:

In the light of the then existing law, we can see no effective meaning to be given to Article 46d–15, other than that the designation of the functions therein as being public and governmental carried with it all of the consequences which such a designation entails, including exemption of the municipality from tort liability.

. . . .

It is clearly within the province of the legislature, when acting reasonably and not arbitrarily, to determine whether an act that may be performed by a city is public in its nature and performed as the agent of the state in furtherance of general law for the interest of the public at large and, hence, governmental. See *Stocker v. City of Nashville,* supra; 38 Am.Jur., Municipal Corporations, sec. 574, p. 269, n. 5. When the function became governmental in its nature, the legal basis was furnished for the exemption of the municipality from liability for torts, indeed, that exemption followed automatically from the nature of the function. (210 F.2d at 920–921)

In the statement of facts in the case certified to us, the Fifth Circuit noted that the Mississippi Legislature, in addition to enacting the Airport Authorities Law in 1958, also enacted the Municipal Airport Law, Chapter 513, Mississippi General Laws (1958). (Codified as section 61–5–47 Mississippi Code Annotated (1973).) The second paragraph of 61–5–47 follows:

No action or suit sounding in tort shall be brought or maintained against the state or any municipality thereof, or the officers, agents, servants, or employees of the state or any municipality thereof, on account of any act done in or about the construction, maintenance, enlargement, operation, superintendence or management of any airport or other air navigation facility.

The first paragraph of section 61–5–47 is the same as section 61–3–83, but the second paragraph of 61–5–47 was not included in the Airport Authorities Act. The addition of the second paragraph specifically providing for tort immunity was not necessary to grant tort immunity because the first paragraph of 61–5–47 unequivocally provides that the acquisition, maintenance and operation of an airport by a municipality is a governmental function.

It is well settled that when a municipality is exercising a governmental function, governmental immunity attaches and the municipality is immune from liability in tort. The two statutes contain a plain and precise statement of public policy. The second paragraph of section 61–5–47 does not add to the tort immunity "which followed automatically from the nature of the function" designated in the first paragraph of the statute.

In addition to the facts stated by the Fifth Circuit, the record shows that the City of Jackson was authorized to issue $3,000,000 of full faith and credit bonds to raise money for the establishment of an airport. This was the genesis of the Jackson Municipal Airport which has grown into a modern facility which eventually required a total of $7,350,000 of bonds of the City of Jackson for its building and construction. The Jackson Municipal Airport Authority was created by the city, operates the Jackson Municipal Airport which was constructed with funds raised by the City of Jackson, and is in fact the alter ego of the City. The majority holding of an immunity liability distinction based on the manner in which a municipality chooses to operate its airport destroys the uniformity of law pertaining to

the operation of municipal airports. The inconsistency which flows from such a ruling fortifies my opinion that, when the legislature provided that the operation of a municipal airport was a governmental function, regardless of whether it was operated by an airport authority or by the municipality, its statement of public policy was intended to and did have the effect of supplanting the public policy as found by this Court in *Brummett, supra.*

## II

I agree with the majority holding on the second question certified.

## III

The majority opinion does not address the third question certified which is: "If the answers to the above questions are in the negative, of what effect on this case was the enactment of the amendment to 61–3–15(b)? Specifically, does the amended 61–3–15(b) authorize suits in tort for claims accruing prior to the amendment's enactment, subject only to statutes of limitation that are otherwise applicable?"

Section 61–3–15(b) was amended by Chapter 396, Section 3, General Laws 1978 effective July 1, 1978 to read in part as follows:

(b) To purchase general liability insurance coverage, including errors and omissions insurance, for the authority, its officials and employees. Nothing contained herein shall be considered as a waiver of immunity in whole or in part as to any governmental function attempted or undertaken by the authority except that where the authority has liability insurance coverage as to any action brought against it, then such action may be maintained against such authority.

It is well established by many cases that this Court has followed the rule that statutes will have a prospective operation only, unless a contrary intention is manifested by a clear and positive expression in the statute. In *Mladinich v. Kohn,* 186 So.2d 481 (Miss.1966) the plaintiff claimed that he was entitled to the benefit of an amendment to the long-arm statute which was to "Take effect and be in force from and after July 1, 1964." The action on which plaintiff sought to bring suit accrued on August 21, 1962 before the effective date of the statute that expanded his remedy. Plaintiff claimed that the statute should be applied retroactively, but this Court disagreed, and held:

The question is whether the legislature intended that statute to be applied retrospectively.

We do not think it did. Chapter 320 is remedial. It did not create a cause of action, but provided a method of obtaining in personam jurisdiction in Mississippi courts for a tort. Although the legislature could have made Chapter 320 retroactive, the issue here is whether such an intent is shown. In a long line of cases, this Court has followed the rule that, in the interpretation of statutes, they will be construed to have a prospective operation only, unless a contrary intention is manifested by the clearest and most positive expression. *Hooker v. Hooker,* 18 Miss. (Smedes & M) 599 (1848); *Brown v. Wilcox,* 22 Miss. (14 Smedes & M) 127 (1850); *Richards v. City Lumber Co.,* 101 Miss. 678, 57 So. 977 (1912); *Power v. Calvert Mortgage Co.,* 112 Miss. 319, 73 So. 51 (1916); *State ex rel. Knox v. Union Tank Car Co.,* 151 Miss. 797, 119 So. 310 (1928); *Bell v. Union & Planters Bank & Trust Co.,* 158 Miss. 486, 130 So. 486 (1930); *Mississippi Central Railroad Co. v. City of Hattiesburg,* 163 Miss. 311, 141 So. 897 (1932); *City of Lumberton v. Schrader,* 176 Miss. 272, 168 So. 77 (1936); *Jefferson Standard Life v. Dorsey,* 178 Miss. 852, 173 So. 669 (1937); *United States Fidelity & Guaranty Co. v. Maryland Casualty Co.,* 191 Miss. 103, 199 So. 278 (1941); *McCullen v. State ex rel. Alexander,* 217 Miss. 256, 63 So.2d 856 (1953); *Klass v. Continental Southern Lines,* 225 Miss. 94, 82 So.2d 705 (1955); *Horne v. State Building Commission,* 233 Miss. 810, 103 So.2d 373 (1958).

This established rule of construction has been phrased in other ways by the

above cases: A statute will not be given retroactive effect unless it is manifest from the language that the legislature intended it to so operate. It will not be construed as retroactive unless the words admit of no other construction or meaning, and there is a plain declaration in the act that it is. In short, these cases illustrate a well-settled attitude of statutory interpretation: A preference that it be prospective only, and a requirement that there should be a clearly expressed intent in the act to make it retrospective. See Note, 63 Col.L.Rev. 1105 (1963); Note, 44 Yale L.J. 358 (1934); 84 C.J.S. Statutes §§ 416, 421, 422 (1953); 50 Am.Jur. Statutes §§ 478, 480, 482 (1944).

Although some of the cases from other jurisdictions, cited in the above authorities, hold that a remedial statute does not come within the general rule against retrospective operation, the Mississippi cases have declined to make that distinction, and we see no sound reason to overrule them. *Hooker v. Hooker,* 18 Miss. (Smedes & M) 599 (1848); *Horne v. State Building Commission,* 233 Miss. 810, 103 So.2d 373 (1958); *Mississippi Central Railroad Co. v. City of Hattiesburg,* 163 Miss. 311, 141 So. 897 (1932); *Bell v. Union & Planters Bank & Trust Co.,* 158 Miss. 486, 130 So. 486 (1930); *Richards v. City Lumber Co.,* 101 Miss. 678, 57 So. 977 (1912).
. . . .

*Hooker v. Hooker,* 18 Miss. (Smedes & M) 599 (1848), involved a statute which provided a new remedy. Jurisdiction of a second suit was denied because there was no clear legislative intent to make the statute retrospective. (186 So.2d at 482, 483, 484)

One of the questions before this Court in *State v. Cummings,* 206 Miss. 630, 40 So.2d 587 (Miss.1949) was whether Chapter 127, Laws of 1944, conferring the right to sue the state for recovery of illegally paid taxes, was retroactive as to rights accrued prior to the passage of the act or was prospective only. In holding that the statute was retroactive, the Court stated:

The Act itself says "If any person, firm or corporation has paid, or shall hereafter pay . . ." taxes for which there was no liability, suit therefor could be brought to recover the same, if payment by the Auditor should be refused. The Act expressly applies to one who "has" paid such taxes. (206 Miss. at 639, 40 So.2d at 589)

The law applied was no different than the rule expressed in *Mladinich,* supra, with regard to statutes which confer a right that did not previously exist. In *Cummings,* the Court held the statute retroactive only because the legislature expressed a clear intent that it be applied retroactively. Cummings does not support appellant's position because section 61–3–15(b) (Supp.1981) does not contain a clear expression by the legislature that the amendment be applied retroactively.

Appellant relies on *Stone v. McKay Plumbing Co.,* 200 Miss. 792, 26 So.2d 349, suggestion of error sustained 30 So.2d 91 (1947). McKay Plumbing Company filed suit against the State Tax Commission under a statute that authorized suit to recover taxes illegally collected. Final judgment was rendered on December 4, 1945 in favor of *McKay* and the Commissioner appealed. While the case was on appeal, the legislature amended the statute on March 19, 1946 to provide that all suits to recover taxes must be filed within three years next after the time of payment of such taxes. Section 10, Chapter 252, Mississippi General Laws 1946. On the original appeal, this Court held that the amended act abated the action as to all payments made more than three years before the suit was filed on the theory that the state's consent to be sued can be repealed and modified at any time, even to the extent of defeating pending suits. The Court then reversed and remanded the case. However, the Court sustained a suggestion of error and affirmed the judgment of the trial court, stating:

The crux of this situation—the point on which the case turns—is that the rights of the parties had been finally fixed and adjudicated by the judgment of the court,

subject to review by this Court on the merits of the case as presented to the lower court. This Court said there was no error on the merits. The Legislature undertakes to wipe out the judgment of a legislative act. (200 Miss. at 820, 30 So.2d at 95)

On suggestion of error, decided by an equally divided Court, the Court held that the legislature cannot by statute divest a person of a judgment obtained in a trial court before the effective date of the statute.

*Stone v. McKay,* does not support appellant's argument that the amendment to 61–3–15(b) should be applied retroactively because this case dealt only with a judgment obtained before a statute was amended which would invalidate the judgment.

I would answer the third question certified and hold that 61–3–15(b) does not authorize suits in tort for claims accruing prior to the enactment of the amendment because we follow the rule that statutes will have a prospective operation only, unless a contrary intention is manifested by a clear and positive expression in the statute. I find no clear and positive expression in the statute making it retroactive.

### CONCLUSION

The amendment to section 61–3–15(b) by the legislature in 1978 authorizing airport authorities to purchase liability insurance and limiting recovery solely to the proceeds of such insurance shows that the legislature was of the opinion it had granted immunity to municipalities operating airports by a municipality airport authority. The amendment specifically provided, "Nothing contained herein shall be considered as a waiver of immunity in whole or in part as to any governmental function attempted or undertaken by the authority ..." This language leads to the inescapable conclusion that the legislature intended section 61–3–83 as a grant of immunity to municipalities operating airports by a municipal airport authority. Otherwise, there was no necessity for the amendment authorizing purchase of lia-

bility insurance and limiting recovery solely to the proceeds of such insurance.

WALKER, P.J., and BROOM and PRATHER, JJ., join in this opinion.